Annette CARMICHAEL, Individually and as Guardian for Keith Carmichael, an incapacitated adult, Plaintiff,

v.

KELLOGG, BROWN & ROOT SERVICES, INC., Halliburton Energy Services, Inc. and Richard Irvine, Defendants.

Civil Action No. 1:06–cv–507–TCB.

United States District Court,
N.D. Georgia,
Atlanta Division.

July 9, 2008.

Davis Kingsley Loftin, Office of Peter A. Law, Keenan R.S. Nix, Morgan & Morgan, P.A., Peter A. Law, E. Michael Moran, Peter A. Law, P.C., Atlanta, GA, for Plaintiff.

David Kasanow, Kurt James Hamrock, Lisa M. Norrett, McKenna Long & Aldridge, Washington, DC, Jonathan R. Friedman, McKenna Long & Aldridge, Atlanta, GA, for Defendants.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

Before the Court is Defendants' renewed motion to dismiss Plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that

Plaintiff's claims are nonjusticiable under the political question doctrine [94].

## I. Background

On May 22, 2004, Sergeant Keith Carmichael, a soldier in the United States Army, was serving as a military escort for a convoy of trucks operated by Defendants Kellogg, Brown & Root Services, Inc. ("KBR") and Halliburton Energy Services, Inc. ("Halliburton"). Carmichael was a passenger in a tractor-trailer driven by Defendant Richard Irvine, a civilian who was an employee of both corporate Defendants.

While traveling from Logistics Support Area Anaconda to Al Asad, Iraq, Irvine lost control of the tractor-trailer and drove off the road, whereupon the tractor-trailer overturned in a ravine. Carmichael was partially ejected from the cab of the tractor. His head and chest were pinned between the tractor and the ground. Six to seven minutes passed before rescuers could dislodge his body. During this time he experienced a loss of oxygen to his brain. Tragically, he suffered massive injuries and is now in a permanent vegetative state.

On February 1, 2006, Carmichael's wife, Plaintiff Annette Carmichael, individually and as her husband's guardian, filed this action in the State Court of Fulton County, Georgia, against KBR, Halliburton and Irvine. She alleges that Irvine negligently operated the tractor-trailer at an excessive speed and failed to maintain control of the tractor-trailer, thereby causing the acci-

dent; she also alleges that Irvine failed to properly inspect Defendants' equipment and vehicle before operating them. Plaintiff further claims that the corporate Defendants are vicariously liable for Irvine's allegedly negligent conduct under the doctrine of respondeat superior and that the corporate Defendants are directly liable for negligently hiring, training and supervising Irvine.

On March 3, 2006, Defendants removed the case to this Court. On March 10, 2006, Defendants moved to dismiss the complaint, arguing that, based on certain U.S. Army regulations regarding convoy operations, Plaintiffs claims were nonjusticiable under the political question doctrine.[1]

On September 19, 2006, this Court denied Defendants' motions, finding that Plaintiffs claims would be barred by the political question doctrine only if "military decision-making or policy would be a necessary inquiry, inseparable from the claims asserted." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 450 F.Supp.2d 1373, 1375 (N.D.Ga.2006) (quoting *Lessin v. Kellogg Brown & Root*, No. H–05–01853, 2006 WL 3940556, at *3, 2006 U.S. Dist. LEXIS 39403, at *7 (S.D.Tex. June 12, 2006)). The Court also found that because the discovery period had just begun, it was impossible to;say with certainty whether this case would require such inquiries into military decision-making as to evoke a nonjusticiable political question.[2] The Court allowed that if additional facts germane to Defendants' political question argument appeared during the discovery pe-

---

1. In the original motion to dismiss, Defendants also contended that as military defense contractors they are immune from liability under the combatant activities exception to the Federal Tort Claims Act. Defendants have not raised this issue in their renewed motion to dismiss.

2. The Court noted, for instance, that it was "conceivable that at the time of the accident Defendant Irvine was driving the truck within the speed limit set by the military yet in a manner that was negligent in some other respect. In that event, the political question doctrine would not necessarily bar Plaintiffs claims." *Carmichael*, 450 F.Supp.2d at 1376.

riod, Defendants could renew their motion to dismiss.

On December 21, 2007, after completion of discovery, Defendants renewed their motion to dismiss, again arguing that Plaintiff's claims are nonjusticiable under the political question doctrine [94]. After considering the motion, Plaintiff's response, and Defendants' reply, the Court granted Plaintiffs motion for oral argument on the motion to dismiss and ordered the parties to submit statements of material fact supported by specific reference to record evidence. The parties submitted their statements of material fact in May, and the hearing on the motion to dismiss took place on May 21, 2008.

Defendants argue that two significant events pertinent to the political question doctrine occurred subsequent to the Court's ruling on Defendants' original motion to dismiss that establish with certainty that this case will involve nonjusticiable political questions. First, Defendants argue that *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331 (11th Cir.2007), endorses *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F.Supp.2d 1277 (M.D.Ga. 2006), a tort case strikingly similar to this case that was dismissed for lack of subject matter jurisdiction based on the political question doctrine. Second, Defendants assert, declarations from four army officers and deposition testimony of five KBR personnel confirm and clarify the military judgments embedded in this suit and the authority the army exercised over every aspect of the military supply convoy.

## II. Legal Standards

### A. Standard on Rule 12(b)(1) Motion to Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) may be based on either a facial or factual challenge to the complaint. *McElmurray v.* *Consol. Gov't of Augusta–Richmond County*, 501 F.3d 1244, 1251 (11th Cir. 2007). In considering a facial challenge, which simply alleges that the plaintiff failed to sufficiently allege a basis for subject matter jurisdiction, a court must accept the allegations in the complaint as true. *Id.* (likening a plaintiff's safeguards to "those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised") (citation and internal punctuation omitted). A factual attack, in contrast, challenges "the existence of subject matter jurisdiction in fact, irrespective of pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* (citation and internal punctuation omitted).

Where, as here, the 12(b)(1) motion involves a factual attack on subject matter jurisdiction and the plaintiff has had an opportunity for discovery and for a hearing on the motion to dismiss, the district court has the power to dismiss based on "the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* (citation and internal punctuation omitted).

### B. Political Question Doctrine

■ The political question doctrine is a function of the separation of powers among the three branches of government, and it "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986).

In *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court set forth six elements indicative of a nonjusticiable political question:

1) a textually demonstrable constitutional commitment of the issue to a coordinate political department;

2) a lack of judicially discoverable and manageable standards for resolving it;

3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

5) an unusual need for unquestioning adherence to a political decision already made; and

6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

These elements are "probably listed in descending order of both importance and certainty." *Vieth v. Jubelirer*, 541 U.S. 267, 278, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004).

At least one of these elements must be evident for the political question doctrine to apply. *Baker*, 369 U.S. at 217, 82 S.Ct. 691. The Court must make "a 'discriminating inquiry into the precise facts and posture of a particular case' before [it] may withhold its own constitutional power to resolve cases and controversies." *Lane v. Halliburton*, 529 F.3d 548, 558 (5th Cir. 2008) (quoting *Baker*, 369 U.S. at 216, 82 S.Ct. 691); *accord McMahon*, 502 F.3d at 1358.

## III. Discussion

### A. Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department

Defendants renew their contention that the first *Baker* element is implicated because Plaintiffs complaint necessarily raises issues that are committed to the discretion of the political branches of government. *See* U.S. CONST. art. I, § 8 (granting to Congress the authority to raise and support armies, to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces); U.S. CONST. art. II, § 2 (granting to the president authority over the conduct of foreign affairs and over the armed forces as commander-in-chief). Defendants argue that because every aspect of the planning and execution of convoy missions—including the route and speed of the convoys—is determined by the military and not by civilian drivers, military decisions would necessarily be questioned were this case allowed to go forward.

### 1. Military Contractors and the Political Question Doctrine

In its Order on Defendants' original motion to dismiss, the Court expressly declined to follow *Whitaker v. Kellogg Brown & Root, Inc.*, 444 F.Supp.2d 1277 (M.D.Ga. 2006).[3] Defendants argue that in *McMa-*

---

**3.** Both this case and *Whitaker* involved noncombat accidents in which a driver for a civilian contractor injured a U.S. soldier serving as an armed escort during a KBR convoy in Iraq.

In *Whitaker*, the district court found—based on the same army regulations regarding convoy operations proffered in Defendants' original motion to dismiss—that because the convoy operation was planned by the military and the military determined the placement of vehicles in the convoy, the speed of the convoy, and the distance between vehicles in the convoy, inquiries regarding military decision-making would be inextricable from the plaintiffs' claims. In this Court's Order denying Defendants' original motion to dismiss, the Court expressly declined to follow *Whitaker*, finding that the army regulations regarding convoy operations were insufficient to establish whether any of the factors set forth in *Baker* apply to Plaintiff's claims.

*hon v. Presidential Airways, Inc.,* 502 F.3d 1331 (11th Cir.2007), which was published after this Court's Order, the Eleventh Circuit endorsed *Whitaker.* Therefore, Defendants contend, this Court should follow *Whitaker* and dismiss the instant case under the political question doctrine.

In *McMahon,* a civilian contractor's airplane crashed in Afghanistan, killing several soldiers whom the contractor had committed to transport. The soldiers' survivors brought a negligence suit against the civilian contractor. Unlike the district court in *Whitaker,* the Eleventh Circuit found that the *McMahon* case did not present a political question.

Although *McMahon* and *Whitaker* arrived at different conclusions, *McMahon* cited *Whitaker* several times. Defendants characterize those citations as favorable and argue that *McMahon* therefore endorses *Whitaker.* Thus, according to Defendants, when this Court is presented with evidence of military control over convoys that is identical[4] to the evidence produced in *Whitaker,* this Court should also find that Plaintiff's claims will require judicial inquiries into sensitive military decision-making and therefore must also dismiss this case. The Court disagrees.

The Court has carefully reviewed *McMahon* and finds that it simply differentiates its facts from *Whitaker*[5] while arriving at the same conclusion that this Court reached in *Carmichael:* If there is no showing that resolution of a survivor's negligence claims would require the Court's reexamination of any decision made by the U.S. military, the case presents no political question, and therefore the Court has jurisdiction over the case. *McMahon,* 502 F.3d at 1359–62; *Carmichael,* 450 F.Supp.2d at 1375.

Thus, the Court concludes that it is not constrained by *Whitaker* but must instead apply the precedent set out in *McMahon.* To invoke the first *Baker* factor, Defendants must first demonstrate that "the claims against [them] will require reexamination of a decision by the military" and that "the military decision at issue is ... insulated from judicial review." *Id.* at 1359–60. The Court found in its Order

**4.** The evidence presented in *Whitaker* and in support of Defendants' original motion to dismiss in this case consisted solely of army regulations regarding convoy operations and the use of civilian contractors. *See* Logistics Civil Augmentation Program, U.S. Army Reg. 700–137 (Dec. 16, 1985) ("LOGCAP"); Army Motor Transport Units and Operations, Army Field Manual 55–30 (undated revision superseding Army Field Manual 55–30 (Mar. 14, 1980)); Contractors Accompanying the Force, U.S. Army Reg. 715–9 (Oct. 29, 1999).

**5.** The Eleventh Circuit noted in *McMahon* that in *Whitaker* the district court found that the suit should be dismissed because it would involve reexamination of a decision by the military; the Eleventh Circuit did not express any opinion regarding *Whitaker*'s factual analysis, instead simply accepting its findings at face value. *See McMahon,* 502 F.3d at 1356 n. 22, 1358 n. 26, 1360 n. 27, 1362. Nor was *Whitaker*'s factual basis examined on appeal.

In *McMahon,* by contrast, the Eleventh Circuit affirmed the district court's finding that even though the airplane crash took place during a military mission, the plaintiffs' allegations related not to decisions for which the military retained responsibility but instead pertained "principally to the operation of the flight, for which [the civilian contractor] retained residual responsibility under the terms of the [Statement of Work]." *Id.* at 1362. Therefore, because the *McMahon* defendants failed to show that the military retained control over the aspects of the contractor's mission that were relevant to the plaintiffs' claims—unlike in *Whitaker,* in which the district court accepted the defendants' showing that the military retained complete control of the convoy—the political question doctrine did not apply to deprive the district court of subject matter jurisdiction.

denying Defendants' original motion to dismiss that the army regulations alone were not sufficient evidence to prove that Plaintiffs claims would require the Court to reexamine a military decision.

## 2. Impact of New Evidence

Defendants contend that in addition to the army regulations proffered along with their original motion to dismiss, the evidence they now provide with their renewed motion will "confirm and clarify the sensitive military judgments involved in this suit and the plenary authority the Army exercised over every aspect of the military supply convoy" and "underscore[ ] the military judgments embedded in this case." Defendants highlight testimony confirming that the army, in commanding a dangerous military mission in an active combat zone, exercised plenary control over the convoy's exact path and speed.

Plaintiff, relying on testimony of the same deponents and on certain KBR training materials, points to testimony indicating that the convoy was a non-combat operation and that each individual driver retained discretion to vary his speed or course within the convoy in order to operate his vehicle safely. Thus, Plaintiff argues, the accident was a result of "Irvine's simple negligence when he drove off the roadway and rolled Defendants' tanker truck" and Plaintiff's claims do not require reexamination of any decisions by the military.

The Court has carefully examined the arguments and all of the evidence presented by each party and finds the proffer sufficient to allow it to conduct the "discriminating inquiry into the precise facts and posture of the particular case" necessary to determine whether the political question doctrine may preclude subject matter jurisdiction over the case. *Lane*, 529 F.3d at 558 (quoting *Baker*, 369 U.S. at 216, 82 S.Ct. 691); *accord McMahon*, 502 F.3d at 1358.

### a. Reexamination of a Military Decision

■ The Court concludes that the army did in fact control every aspect of the organization, planning and execution of the convoy in question. The KBR drivers were trained according to military standards, the military convoy commander retained responsibility for inspecting both drivers and their equipment before commencing the convoy, and the route and speed of the convoy were set by the military and not by the civilian drivers. Therefore, the conduct of the military and its handling of supply convoys used to support military operations would necessarily be questioned were this case allowed to go forward.

The army regulations proffered with Defendants' original motion to dismiss established the military's planning and supervisory role in conducting the LOGCAP convoys.[6] Testimony from the contrac-

---

**6.** Army regulations authorize the use of civilian contractors to provides selected services in wartime to augment army forces and free the military units to perform other duties. *See* LOGCAP at 1–1. The military recognizes that use of civilian contractors increases risk and that their performance "cannot be accurately predicted," and thus the major army commands are charged with "evaluat[ing] each logistical support function, defin[ing] the acceptable degree of risk, and balanc[ing] its military and contractor support mix accord-

ingly." LOGCAP at 2–4. Although commanders evaluating use of contractors must both assess the risk to the overall mission and consider the safety of contractor personnel, LOGCAP contractors are used for providing transport assistance when the army determines that contractor support is "the most effective, expeditious, or cost effective" means. FM 55–30 at 1–11; LOGCAP at 3–1.

The object of the motor transport units is to provide "a seamless transportation system that supports the movement requirements of

tors, proffered with the renewed motion to dismiss, makes clear that the army controlled the conduct of Carmichael's convoy at the most granular level. To a person, all of those testifying confirmed that the military commander set the convoy's pace and had the sole authority to adjust it. In setting the pace, the military commander was to consider the quality of the road, the capabilities of the trucks in his convoy, his drivers' skills, and the risk of enemy threat, among other things. Each vehicle in the convoy was ordered to follow a prescribed distance behind and exactly in the tire tracks of the vehicle in front of it.

Although Plaintiff makes much of Irvine's testimony that the individual drivers retain ultimate responsibility for the safe conduct of their vehicles, the statements she relies upon do not hold up under close scrutiny. Of course the driver is responsible for keeping his truck on the road; of course the driver would be the person to apply his truck's brakes; of course the military does nothing to "lock in" the speed of each convoy vehicle; of course a driver involved in an accident whose company command concluded the accident happened because his vehicle was traveling too fast for conditions would tell the accident review board that if he had it to do over, he would slow down—the army employs human beings, not automatons, to drive its trucks. None of this means that the army was not responsible for setting the convoy speed.

No more credible is Plaintiff's representation that KBR drivers were subject to KBR's control and direction rather than the military's. Although KBR trained the drivers and communicated orders to them, the military trained KBR's instructors and gave KBR the orders the civilian convoy commander communicated to his drivers.

the joint force and the Army." FM 55–30 at 1–1. Though the employees of LOGCAP contractors generally are not under the direct supervision of the military, and contractors are never placed "in a position of command, supervision, administration, or control" over army personnel, the military and its contractors are expected to work closely together. LOGCAP at 3–2(d)(2–3); *accord* FM 55–30 at 1–1 (establishing that the army is expected to integrate LOG CAP and other contract support and to "fight as a total force—active and reserve components and civilians."). Contractor employees are "expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander." Army Reg. 715–9 at 3–2(f) (providing that although the military does not directly supervise contract employees, if the employee of a contractor violates the theater commander's orders, the theater commander may direct the contracting officer to demand that the contractor replace the employee).

The army regulations and directives also provide for the control, organization and planning of convoy operations, from vehicle maintenance to force protection. *See* FM 55–30 at ch. 5, 6, 9. The military convoy commander is responsible for preparing and planning convoy operations, and the plans are made according to standard operating procedures ("SOPs") developed by the military that encompass such matters as the duties of the military convoy commander and other convoy control personnel, convoy organization, preparation of convoy vehicles, operations security measures, and the maintenance and recovery of disabled vehicles. *Id.* at 5–5. Military personnel also plan the route, determine placement of the vehicles within the convoy, set the space between vehicles, set the pace of the convoy, and coordinate all matters pertaining to convoy security, including the use of convoy escorts. *Id.* at 5–4. Factors impacting planning include "[m]ission, enemy, troops, terrain, ... time available to drive[,] ... the state of training of drivers, types of loads, number of vehicles involved, traffic conditions, quality of road networks, [and] time." FM 55–30 at 5–1.

The military convoy commander is also responsible for inspecting personnel and vehicles in preparation for the convoy. *Id.* The regulations address preventative maintenance requirements and establish that the "commander of the moving unit is responsible for the mechanical condition of his vehicles." FM 55–30 at 5–6; ch. 9.

The Court also finds no credibility in the KBR "commander handbook" that Plaintiff contends proves that KBR planned and controlled the convoys; the handbook was not authenticated, and witnesses referred to the handbook as inaccurate guidelines that in any case were subordinate to military direction.

Plaintiff's characterizations ignore the convoy driver's reality. The drivers were subject to military orders regarding the speed and path of the convoy, and exercise of any inherent discretion to slow down would necessarily involve disrupting the military's pace and the ordered following distance. By slowing down or changing course, the driver would be implicitly reexamining the military's decision to maintain the convoy speed and path set by the military convoy commander.

Likewise, in this negligence action, during which the Court would be required to determine the proximate cause of the accident, the military's decisions regarding driver training, inspection of the drivers and vehicles, and the speed and path of the convoy would be "inextricable from the case at bar" and thus would also necessarily come into question. *See Baker*, 369 U.S. at 217, 82 S.Ct. 691.

### b. Type of Decision Insulated from Judicial Review

To invoke the first *Baker* factor in an action against a civilian contractor, it is not enough for the contractor to show that the claims against it will require reexamination of a military decision; the contractor must also show that the military decision at issue is of the type that is typically insulated from judicial review. *McMahon*, 502 F.3d at 1359–60.

In other cases, courts have declined to exercise jurisdiction over claims that would require examination of "core military decisions, including [military] communication, training, and drill procedures" or "[t]he

strategy and tactics employed on the battlefield." *McMahon*, 502 F.3d at 1359 (referring to *Aktepe v. United States*, 105 F.3d 1400 (11th Cir.1997), a case in which a U.S. ship accidentally fired a live missile at a Turkish ship during a training exercise, and *Tiffany v. United States*, 931 F.2d 271 (4th Cir.1991), a case in which a military fighter sent to intercept a private plane that failed to file a proper flight plan instead collided with it). Like *Aktepe* and *Tiffany*, this case would also require the Court to examine core military decisions and battlefield tactics.

Despite Plaintiff's numerous attempts to characterize the conditions under which the convoy was conducted as non-hostile, the convoy was ordered to conduct a highly dangerous wartime military mission under imminent enemy threat. The convoy took place during a period in which insurgent activity was so threatening that the military began restricting convoys to no more than fifteen vehicles. The military required the vehicles in the convoy to be spaced far enough apart to avoid presenting a condensed enemy target, yet close enough together to not lose artillery cover. The convoy was on constant lookout for improvised explosive devices ("IEDs") and sniper fire.

The military knew the mission was not safe but conducted it because the military needed fuel in Al Asad. ASR Phoenix, the road on which the rollover took place, was known to be highly dangerous and poorly maintained, but was considered by the military to be the safest route by which to move supplies from Anaconda to Al Asad. ASR Phoenix was a paved one-lane road that often harbored IEDs and oil slicks that insurgents created in attempts to force drivers toward the IEDs. The road contained poorly engineered curves that were banked the wrong way.

KBR personnel testified that convoys were attacked almost daily. Although the convoy did not have direct contact with any IEDs prior to the rollover, it was delayed prior to the rollover while the military detonated an IED in front of the convoy that preceded it, and after the rollover, the remaining vehicles in Carmichael's convoy encountered small-arms fire and an IED that caused severe injuries to a KBR driver.

Despite the enemy threat and the dangerous terrain, the military determined that LOGCAP support was appropriate. It notified KBR that the military needed its support in transporting jet fuel to Al Asad. KBR, with the military's approval, assigned Irvine to drive an 80,000–pound tanker containing jet fuel in the convoy. The military briefed the KBR drivers on the route and ordered them to follow the lead military truck's speed and maintain the prescribed spacing in order to minimize exposure to insurgent threat. Each driver was also ordered to follow in the exact tire tracks of the vehicle ahead of him in order to avoid triggering IEDs. As added security, the military assigned army shooters to several trucks in the convoy.[7] The military commander in the lead military vehicle set the pace; he knew that the S-curve was precarious and chose not to slow the convoy speed to accommodate it.

"The strategy and tactics employed on the battlefield are clearly not subject to judicial review." *McMahon*, 502 F.3d at 1359 (quoting *Tiffany*, 931 F.2d at 277). The Court finds that the rollover occurred in the course of Irvine's employment with KBR, as the contractor worked with the army to carry out the strategy and tactics the army had established for its battlefield mission. Therefore, the military decisions that would be questioned in this case are of the type typically insulated from judicial review.

Consequently, the Court finds that Plaintiff's negligence claims invoke the first *Baker* factor and thus present a nonjusticiable political question.

## B. Lack of Judicially Discoverable and Manageable Standards for Resolving the Issue

Defendants also argue once again that the second *Baker* factor applies to this case because no judicially manageable standards exist for the resolution of the issues. Defendants claim that if this case is not dismissed, the Court will be required to evaluate the conduct of both the military and Defendants without having any standards with which to do so. Plaintiff argues that the case does not involve any issues which would give rise to judicially unmanageable standards and may be resolved by application of established negligence standards.

The Court agrees with Defendants that there are no judicially discoverable and manageable standards for resolving Plaintiffs claims. Now that the facts have been more fully developed, it is clear that contrary to Plaintiff's assertions, Irvine's driving responsibilities for KBR in Iraq were *not* "the same as if he was in Pensacola," and unlike the plane crash in *McMahon*, the Carmichael convoy did involve activity over which the military retained responsibility. The rollover took place on a route notorious for lethal insurgent activity while Irvine helped to transport jet fuel from one military camp to another as part of the convoy Carmichael was assigned to help protect. The military planned the opera-

---

7. Carmichael was assigned to Irvine's truck. The military had trained Carmichael on his duties as a shooter and had provided defensive driving training to KBR personnel who in turn trained their drivers to the military's standards.

tion and determined the placement of the vehicles in the convoy, their speed, and the spacing between the vehicles.

Thus, the question before the Court would not be what a reasonable driver would have done, or even what a reasonable driver in a "less than hospitable environment" would have done. *See McMahon,* 502 F.3d at 1364 (noting that because flying over Afghanistan during wartime was different from flying over Kansas on a sunny day, the district court would "have to apply a standard of care to a flight conducted in a less than hospitable environment, [but] that standard is not inherently unmanageable."). Instead the question before the Court would be what a reasonable driver subject to military control over his exact speed and path would have done. Again, this would necessarily require questioning the military's decisions regarding the planning and conduct of the convoy, presenting political questions over which the Court may not exercise jurisdiction.

### C.  Third and Fourth *Baker* Factors

Finally, Defendants again claim that the third and fourth *Baker* factors apply because the standards of interaction between the military and civilian contractors in a combat zone require initial policy decisions clearly committed to the discretion of the political branches, and a judicial decision calling into question the conduct of the United States concerning its ongoing military efforts in Iraq would express a lack of respect due to the coordinate branches of government that oversee those war efforts.

Because the Court has already found that this case presents nonjusticiable political questions under the first and second *Baker* factors, the Court declines to reach these additional arguments.

### IV.  Conclusion

For the foregoing reasons, the Court finds—reluctantly—that this action presents a nonjusticiable political question, and consequently, the Court lacks subject matter jurisdiction over the case. Therefore, Defendants' 12(b)(1) motion is hereby GRANTED [94]. The Clerk is DIRECTED to close the case.