**Lelav AMEDI, individually, and as the Administratrix of the Estate of her husband Rebar Amedi, and on behalf of her minor children, Lana Amedi and Aryan Amedi, Plaintiff,**

v.

**BAE SYSTEMS, INC., et al., Defendants.**

**Civil Action No. 1:10–cv–01557–JOF.**

United States District Court, N.D. Georgia, Atlanta Division.

April 22, 2011.

Thomas McKee West, Office of Thomas M. West, Atlanta, GA, for Plaintiff.

Kristen M. Kelly, John Arthur Mozley, Mozley, Finlayson & Loggins, LLP, Atlanta, GA, Allison Kendrick, Bruce Campbell, Mack H. Shultz, Jr., Perkins Coie, Seattle, WA, for Defendants.

### ORDER

J. OWEN FORRESTER, Senior District Judge.

This matter is before the court on Defendants' motion for leave to file excess pages [18] and Defendants' motion to dismiss [19].

## I.  Background

### A.  Procedural History and Facts

Plaintiff, Lelav Amedi, individually and as administratrix of the estate of her husband, Rebar Amedi, and on behalf of minor children, Lana and Aryan Amedi, filed suit against BAE Systems, Inc., BAE Systems Land & Armaments L.P.; and BAE Systems Tactical Vehicle Systems LP, on April 16, 2010, in the Superior Court of Fulton County, alleging product defect, negligence, and breach of warranty claims arising out of the death of Rebar Amedi, a civilian contractor translator stationed with the United States Army in Iraq. Defendants removed the suit to this court on May 21, 2010, and filed the instant motion to dismiss contending that Plaintiff's claims are barred by the political question doctrine and the combatant activities exception to the Federal Tort Claims Act.

Because Defendants make a factual attack on the subject-matter jurisdiction of the court, the court is permitted to review facts outside of the complaint and need not view those facts in the light most favorable to Plaintiff. *Carmichael v. Kellogg, Brown & Root Servs., Inc.,* 572 F.3d 1271 (11th Cir.2009). In any event, the facts are generally undisputed and the court recounts them here based on the parties' joint submission of a Stipulation of Undisputed Facts Relating to the Motion to Dismiss which contains numerous documents, including a Fatality Investigation Report of the United States Army. *See* Docket Entry [19], Exh. 2. The court also notes that it held a scheduling conference on October 7, 2010, at which time Plaintiff agreed that no additional fact discovery was necessary in order for the court to rule on Defendants' motion.

On April 21, 2008, during the war in Iraq, the United States Army planned a mission to capture enemy insurgents suspected of attacking coalition forces with improvised explosive devices. Army personnel at Forward Operating Base Summerall planned a three vehicle convoy to travel to specific locations to search for the suspected insurgents. The mission and the convoy were under the authority, supervision, and control of the United States Army. The convoy included fourteen coalition soldiers, ten members of the Sons of Iraq, and Rebar Amedi who worked as a civilian contractor translator. After capturing two insurgents, the convoy proceeded to the next location along a road selected by the platoon leader.

Mr. Amedi rode in the third vehicle of the convoy in a Mine Resistant Ambush Protected ("MRAP") vehicle called a Caiman. The Caiman ran over a pressure wire which triggered an improvised explosive device. The 20–ton Caiman in which Mr. Amedi was traveling was propelled into the air and came to rest on the driver's side over 100 feet away. There were eight occupants in the passenger compartment of the Caiman which was designed to hold only six people. None of the occupants wore a seat belt and the doors to the compartment were not combat locked. The equipment stored in the MRAP was secured only by bungee cords and parachute cord, instead of ratcheting straps. Even though the passenger compartment was intact, the rear doors came off and it appears that Mr. Amedi was thrown from the vehicle and he sustained fatal injuries.[1]

In response to an urgent need to offer greater protection to military personnel from the mines and improvised explosive devices used by Iraqi insurgents, the United States military initiated the MRAP program at the end of 2006. By 2007, the vehicles were in design and production. Secretary of Defense Robert M. Gates declared the MRAP program a highest priority in the Department of Defense and more than 1500 MRAP vehicles were deployed in Iraq by December 2007.

BAE Systems Tactical Vehicle Systems LP was invited to submit a design for an MRAP vehicle and the Government even-

tually requested four test vehicles. On July 13, 2007, the Government ordered 1,170 Caiman vehicles from BAE Systems Tactical Vehicle Systems LP.

### B. Contentions

Defendants argue that the court should dismiss Plaintiff's complaint as a nonjusticiable political question because to evaluate Plaintiff's complaint would require the court to re-examine military decisions. Defendants also contend that Plaintiff's complaint should be dismissed under the combatant activities exception to the Federal Tort Claims Act because the claim arises from combatant activities during a time of war.

Plaintiff responds that the court need not evaluate military decisions in the course of adjudicating Plaintiff's complaint because Plaintiff argues that Defendants were negligent in their design and manufacture of the MRAP in that the vehicle failed to protect Mr. Amedi from the blast of the improvised explosive device. Plaintiff contends there is no evidence that the vehicle speed, route, number of occupants, failure to properly secure the rear doors of the MRAP, or lack of seat belt use had anything to do with the failure of Defendants' design.

### II. Discussion

The Eleventh Circuit has explored the continuum of the political question doctrine in the context of private contractor liability

---

1. Plaintiff does dispute whether Mr. Amedi was thrown out of the back of the MRAP during the attack. This factual dispute is not relevant to the court's determination of the political question doctrine issue. The court does note, however, that a reading of each post-incident interview and the Army's review shows complete agreement that the passenger area of the MRAP was not breached by the explosion and that the rear doors of the vehicle were not combat-locked and were blown open. As a result of the explosion, the MRAP

was thrown into the air and rolled approximately 2–3 times before stopping. Numerous passengers, including Mr. Amedi, were found outside of the MRAP. Plaintiff points to a particular sworn statement that Mr. Amedi was found "at the back of the MRAP" but the only plausible understanding of that statement in the context of all of the documents is that after the explosion, Mr. Amedi's body was located behind (and outside) the vehicle. He was not located within the vehicle.

for combat deaths in two cases: *Carmichael v. Kellogg, Brown & Root Servs., Inc.,* 572 F.3d 1271 (11th Cir.2009) and *McMahon v. Presidential Airways, Inc.,* 502 F.3d 1331 (11th Cir.2007). The court reviews these cases in detail as the parties agree they are controlling.

In *Carmichael,* the plaintiff was the wife of a sergeant in the United States Army. Sergeant Carmichael was severely injured in May 2004 while serving as an armed escort for a large military convoy traveling through a war zone in Iraq. The district court ruled that the suit was non-justiciable on political question grounds and dismissed the case for lack of subject-matter jurisdiction. On appeal, the plaintiff argued that the political question doctrine did not apply to her suit because a civilian contractor, and not the military, was responsible for the accident that injured her husband. The Eleventh Circuit, however, affirmed the district court finding that "adjudicating the plaintiff's claims would require extensive reexamination and second-guessing of many sensitive judgments surrounding the conduct of a military convoy in war time—including its timing, size, configurations, speed, and force protection." 572 F.3d at 1275.

The details of *Carmichael* show significant similarity with the facts of the instant case. In *Carmichael,* on May 22, 2004, a military convoy of vehicles was tasked with transporting fuel from Camp Anaconda (located north of Baghdad) to Al Asad, an American air base located west of Baghdad. The fuel was carried in tanker trucks operated by Kellogg, Brown & Root Services, Inc. and Halliburton Energy Services, Inc. Because of the dangerousness of the convoys, they were heavily militarized. *Id.* at 1276. Sergeant Carmichael was a military escort assigned to ride in one of the tanker trucks. The missions were led by a military convoy commander which gave the military "plenary control" over the convoys. *Id.* It was "the military, not civilian contractors, that decides when convoys are to be arranged, the routes to be traveled, the amount of fuel or other supplies to be transported, the speed at which the vehicles are to travel, the number of vehicles to be included in the convoy, the spacing to be maintained between the vehicles, and the security measures to be employed, and other details of the mission." *Id.*

On May 22, 2004, the sixth tanker in the route was driven by David Irvine, a KBR employee who had driven five or six previous convoys, and three over this particular route. Sergeant Carmichael was assigned as a military escort for Irvine's tanker. *Id.* at 1278. At one point, the tankers in the convoy were required to negotiate S-curves. In the midst of one of the curves, Irvine's tanker veered off the road and rolled over. *Id.* Sergeant Carmichael was thrown from the vehicle and partially pinned beneath it. He suffered severe brain injuries due to lack of oxygen and has been in a permanent vegetative state since the incident. *Id.* A KBR Post Accident Review Board determined that the cause of the accident was Irvine's traveling at an excessive speed while negotiating a curve and not paying attention to surroundings. Irvine was permanently removed from driving duties. *Id.*

Sergeant Carmichael's wife filed suit against KBR, Halliburton, and Irvine asserting that Irvine had been negligent in traveling at an excessive speed, failing to keep a proper lookout, and failing to inspect his vehicle before operating it. She sought to hold KBR and Halliburton liable under a theory of respondeat superior, negligent hiring, and negligent training. Prior to the start of discovery, the defendants moved to dismiss the case on the basis of political question doctrine. The district court found the defendants' motion

to be premature. After the completion of discovery, however, KBR moved again to dismiss on the basis of political question doctrine and the district court granted the motion at that time.

In reviewing the order of the district court, the court discussed the parameters of the political question doctrine, noting that it "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Id.* (citing *Japan Whaling Ass'n v. American Cetacean Soc.*, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986)). In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court outlined a list of six factors to be used in determining whether a dispute raises a non-justiciable political question. At least one of the factors must be present to dismiss a case on political question grounds. *See Carmichael*, 572 F.3d at 1280. Those factors are:

1. a textually demonstrable constitutional commitment of the issue to a coordinate political department;

2. a lack of judicially discoverable and manageable standards for resolving it;

3. the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;

4. the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;

5. an unusual need for unquestioning adherence to a political decision already made; or

6. the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Aktepe v. United States*, 105 F.3d 1400, 1402–03 (11th Cir.1997).

Because the district court found that factors one and two applied, the Eleventh Circuit focused on those considerations in its appeal. While the court recognized that not all military judgments were completely immune from judicial review, it did find that in these circumstances, the suit "would require reexamination of many sensitive judgments and decisions entrusted to the military in time of war." *Id.* at 1281. The court found

> [a]s we have recounted, military judgments governed the planning and execution of virtually every aspect of the convoy in which Sergeant Carmichael was injured. At the broadest level, these include the military's decision to utilize civilian contractors in conducting the war in Iraq, and its decision to use the contractors specifically in connection with fuel-transportation missions such as the one at issue here. The rollover in which Sergeant Carmichael was injured never would have taken place if these basic decisions had not been made.

*Id.* The court explained that the military decided: the particular date and time for the convoy's departure; the speed at which the convoy was to travel; the decision to travel upon a particular road; how much fuel to transport; the number of trucks required for the mission; the distance to be maintained between vehicles; and the security measures taken. *Id.* "Each of these critical determinations was made exclusively by the military." *Id.* at 1282.

The court also held that "each of these decisions required the specific exercise of *military* expertise and judgment." *Id.* (emphasis in original). Military commanders balanced the risk of traveling in convoys over dangerous roads with the need to have fuel. They also made tactical deci-

sions concerning the speed to avoid insurgent attacks, but also operate vehicles safely on narrow roads. *Id.* KBR had no role in making these decisions. *Id.* The court rejected the plaintiff's arguments that it was Irvine who controlled his vehicle. "The fact that Irvine had physical control over his tanker does not change the fact that he was operating at all times under orders and determinations made by the military." *Id.* at 1284.

The court also rejected the plaintiff's argument that the court would not need to "review" any of the military judgments to reach a conclusion in the case because the record clearly demonstrated that Irvine's negligence was the cause of the accident. *Id.* at 1285. Instead, the court found that the KBR accident review board's determination was not conclusive and that given the "multiple hazards" present during the convoy run, "the rollover might have been caused by any number of factors entirely beyond Irvine's control." *Id.* The court also noted that the plaintiff would not be able to show that Irvine's actions were the **only** cause of the accident, particularly pointing to the fact that the Army had instructed military escorts such as Sergeant Carmichael **not** to wear seatbelts. *Id.* at 1286. As a result, the court concluded that in defending the suit, KBR would "inevitably ... try to show that unsound military judgments and policies surrounding every aspect of the May 22 convoy were either supervening or concurrent causes of the accident. Litigation involving these issues is undeniably foreclosed by the political question doctrine." *Id.*

The court concluded its review of the first *Baker* factor by stating "there can be little doubt that the military decisions plainly drawn into issue today—concerning how to safely deliver vital military supplies through hostile territory in war time—are among the 'complex, subtle, and profes-

sional decisions as to the composition, training equipping, and control of a military force' that are 'essentially professional military judgments' and that are properly insulated from judicial review." *Id.* at 1288 (citations omitted).

The court of appeals next went on to consider whether the case also implicated the second *Baker* factor: the lack of any judicially discoverable and manageable standards for resolving the dispute. The court agreed with the district court's determination that there is no readily available judicial standard to answer the question of what a reasonable driver subject to military control would have done in the circumstances. *Id.* at 1288–89. It was not a matter of what standards a fuel tanker driver would be held to going from Miami, Florida to Savannah, Georgia on 1–95. *Id.* Rather in evaluating the driver's conduct over a combat route, judges and juries would not have common sense and everyday experience upon which to draw to decide the negligence issue. *Id.* at 1289.

The court of appeals particularly distinguished its previous case in *McMahon.* *Id.* at 1290.[2] In *McMahon,* three American soldiers were killed when the plane that was transporting them crashed into a mountain in Afghanistan. The soldiers' families brought a wrongful death suit against Presidential Airways, the civilian corporation that the military had contracted with to provide air transportation in Afghanistan. The *McMahon* court held that the political question doctrine did not bar consideration of the plaintiffs' claims because it was impossible to determine whether the suit would require a reexamination of any military decision. 502 F.3d at 1360. The court also stated that:

> [w]e readily acknowledge that flying over Afghanistan during wartime is different from flying over Kansas on a

---

**2.** Judge Marcus, who authored the opinion in    *Carmichael,* was on the panel for *McMahon.*

sunny day. But this does not render the suit inherently non-justiciable. While the court may have to apply a standard of care to a flight conducted in a less than hospitable environment, that standard is not inherently unmanageable. The flexible standards of negligence law are well-equipped to handle varying fact situations. The case does not involve a sui generis situation such as military combat or training, where courts are incapable of developing judicially manageable standards.

*Id.* at 1362.

The *Carmichael* court distinguished *McMahon* finding that "the military's authority and responsibility over Presidential's activity was limited and discrete. Consequently, there was no necessary reason for thinking that adjudicating the suit would require the court to review military decisions." *Id.* at 1290. Further, the accident in *McMahon* took place during a "routine airplane flight." *Id.* at 1290–91. "McMahon never claimed that the military activities in Afghanistan were related in any way to the accident." *Id.* at 1291. In contrast, in Carmichael's suit "the military dimension of the underlying events is utterly central: the convoy's mission was to deliver fuel supplies necessary for military operations; the conditions under which the convoys traveled were not merely 'inhospitable'; they were potentially life-threatening." *Id.* Finally, the *McMahon* court did allow the possibility that further factual development of the record might eventually show the need for the application of the political question doctrine. *Id.* The *Carmichael* court also distinguished *Lane v. Halliburton,* 529 F.3d 548 (5th Cir.2008), noting that the *Lane* decision was made prior to a factual development of the record and contained both fraud and negligence-based claims. *Id.*

The court finds the circumstances of Plaintiff's suit here more closely match those of *Carmichael* than *McMahon.* The very same military determinations led to the organization and arrangement of the convoy here as did to the convoy in *Carmichael.* The only difference is *Carmichael* involved the delivery of fuel whereas the purpose of the convoy in the instant case was to search out and transport insurgents, a task which arguably implicates even more military considerations than the transportation of fuel from point A to point B in combat conditions. Furthermore, unlike the situation in *Carmichael* where the tanker was driven by a civilian contractor, here, all of the personnel involved, but for Mr. Amedi, were military personnel. Mr. Amedi was undisputedly under the complete control and authority of the United States military at the time of the incident.

Plaintiff, here, makes the same arguments as the plaintiff in *Carmichael.* She contends that the court need not review any military determinations because her allegation is that negligent manufacturing of the Camain caused the fatal injury to Mr. Amedi. Although not articulated in detail at this stage in the proceedings, in her complaint, Plaintiff states that the vehicle designed by Defendants failed to meet the Government's specifications. In her response to Defendants' motion to dismiss, Plaintiff states that Defendants failed to design and manufacture a vehicle "to protect plaintiff's decedent from the IED blast." *See* Response, at 2. Plaintiff avers there is "no evidence" to demonstrate that the vehicle speed, route, number of occupants, failure to properly secure the equipment of the MRAP, lack of seat belt use, or the failure to combat lock the rear doors had anything to do with the failure of Defendants' design. However, the issue at this stage is not a merits discussion of who would be liable for any negligence that might have occurred. The issue is whether in reaching a determina-

tion on the merits the court or the jury would need to evaluate military decisions.

Just as the plaintiff in *Carmichael* contended that the court would only need to evaluate the negligent driving of Mr. Irvine, the matter is not so simple. Defendants here would inevitably raise the issues of the formation of the convoy, the number of vehicles selected, the route used, whether there were sufficient safeguards taken to avoid improvised explosive devices, and so forth, as a means of defending against liability and rebutting Plaintiff's assertion that issues of manufacturing were the sole cause of Mr. Amedi's death. The fact that Plaintiff desires to assert liability only against the BAE Systems Defendants does not mean that these military decisions would not need to be considered by the court or the jury.

The inevitability of such a defense is demonstrated in the Army's own review of the incident as a result of which numerous recommendations were made, including having patrols avoid roads that funnel coalition vehicles (noting that two trails on the side of the gravel road were used by civilians) and reducing the speed of convoys so as to better identify improvised explosive devices. *See* Stipulations of Facts, at 57. The report also stated that bungee cords were not sufficient to strap down equipment and that ratcheting straps were necessary, further seatbelts (with certain exceptions) should be used and the doors combat locked. *Id.* at 58. Other handwritten notes indicate that an "improper route" was selected due to the fact that an explosion occurred in the same location two weeks previous to the convoy. *Id.* at 63. These recommendations reflect decisions that could only be made by the military during a time of combat. They are tactical battlefield determinations of the same variety that *Carmichael* instructs are immune from review under the political question doctrine.

It is not the mere fact that the incident took place in Iraq during combat operations in time of war that renders Plaintiff's claim subject to the political question doctrine. Rather, it is because in adjudicating Plaintiff's claim that the court will be required to examine decisions concerning military matters that could only have been made by the United States military personnel who controlled all aspects of the operation conducted on April 21, 2008.

In fact, the military decisions that could potentially have contributed to Mr. Amedi's death go further back than merely on the date in question. The military determined it was a priority that a new vehicle be designed to address improvised explosive devices. The military made the decision to fast-track the production of such a vehicle. The military determined what type of vehicle it wanted for the job. The court recognizes that Defendants have also raised a Government Contractor Defense, *see Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988), that would specifically address some of these issues. However, at bottom, the political question doctrine instructs that the court should not re-examine quintessentially military decisions of the military. In every aspect, even beyond the organization of the convoy on the day in question, this case would require the reexamination of military decisions.

This is in marked contrast to *McMahon* where the court found that it would not need to evaluate any decisions made by the military. The court stated that the decisions of negligence were related to the areas of responsibility delegated to Presidential Airways, the private contractor, by the Statement of Work in its contract with the military. That contract required Presidential to provide all necessary services to transport passengers and cargo on missions requested by the Department of Defense. *See* 502 F.3d at 1360. Thus,

Presidential—and not the military—had "general responsibility" for making decisions regarding the flights it provided to the Department of Defense. *Id.* The Statement of Work also left with Presidential the "ultimate responsibility" of ensuring the safety of the flights it was providing. *Id.* at 1360–61. In contrast, the military chose only the start and end points for the flights and when they would be flown. *Id.* at 1361. The military did set limits on pilot flight time and number of passengers and cargo that could be carried, but none of the plaintiffs' allegations related to these discrete tasks. *Id.* These facts from *McMahon* are markedly distinguishable from the convoy operation in the instant case and render *Carmichael* the more directly applicable precedent.

For these reasons, the court finds that both the first and second *Baker* factors apply and this is a non-justiciable political question matter. The court GRANTS Defendants' motion to dismiss [19]. Because the court finds the political question doctrine applies, the court does not go on to consider Defendants' argument that Plaintiff's claim is barred by the combatant activities exception to the Federal Tort Claims Act.

## III. Conclusion

The court GRANTS Defendants' motion for leave to file excess pages [18] and GRANTS Defendants' motion to dismiss [19].

The Clerk of the Court is DIRECTED to DISMISS WITH PREJUDICE Plaintiff's complaint.