[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14487

_____

D. C. Docket No. 06-00507-CV-TCB-1

ANNETTE CARMICHAEL, Individually and as
Guardian for Keith Carmichael,
KEITH CARMICHAEL, an incapacitated adult,

Plaintiffs-Appellants,

versus

KELLOGG, BROWN & ROOT SERVICE, INC.,
HALLIBURTON ENERGY SERVICES INC., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 30, 2009)

Before MARCUS, KRAVITCH, and ANDERSON, Circuit Judges.

MARCUS, Circuit Judge:

At issue today is whether the district court erred in dismissing the plaintiff's negligence suit arising out of an accident in which her husband, a sergeant in the United States Army, was severely injured in May 2004 while serving as an armed escort for a large military convoy traveling through a war zone in Iraq. The district court held that the suit was non-justiciable on political question grounds and dismissed the case for lack of subject-matter jurisdiction. On appeal, the plaintiff contends that the suit does not implicate the political question doctrine because a civilian contractor, and not the military, was responsible for the accident.

After thorough review, we conclude that adjudicating the plaintiff's claims would require extensive reexamination and second-guessing of many sensitive judgments surrounding the conduct of a military convoy in war time -- including its timing, size, configurations, speed, and force protection. In addition, we can discern no judicially manageable standards for resolving the plaintiff's claims. Accordingly, we hold that the political question doctrine bars the plaintiff's suit, and we affirm the district court's dismissal for lack of subject-matter jurisdiction.

## I.  BACKGROUND

### A.    Factual Background

The tragic accident at the center of this case occurred on May 22, 2004 during a military operation in Iraq. On that day, a military convoy of vehicles had

been organized to transport JP-8 fuel from Camp Anaconda, a military base near the town of Balad, Iraq, roughly 45 miles north of Baghdad, to Al Asad, the second largest American air base in Iraq, located in Anbar province, approximately 100 miles west of Baghdad. [Brocket Dep. 126:9-13; Hansen Decl. ¶ 5]. The fuel was carried in tanker trucks operated by Kellogg, Brown & Root Services, Inc. ("KBR") and Halliburton Energy Services, Inc. ("Halliburton"),[1] civilian corporations that had entered into a contract with the United States Military in 2001 to provide logistical services in connection with its conduct of the war in Iraq.[2]

---

[1] See Contract No. DAAA09-02-D-0007. KBR was a subsidiary of Halliburton until 2007, at which time KBR became an independent corporation. For purposes of this discussion, unless otherwise indicated, references to KBR are meant to include both corporate defendants.

[2] The agreement was made pursuant to the military's Logistics Civil Augmentation Program ("LOGCAP"). U.S. Army Reg. 700-137. Initiated in 1985, LOGCAP allows "civilian contractors to perform selected services in wartime to augment Army forces," thereby "releas[ing] military units for other missions or [to] fill shortfalls." Id. at 1-1.

LOGCAP regulations define the general contours of the military's relationship with civilian contractors. The specific nature of the military's relationship with KBR was further governed by a patchwork of other agreements and instruments. Thus, for example, the Army Field Manual contains numerous regulations specifically addressing the relationship between the military and civilian contractors such as KBR whose role, like KBR's, includes participation in military convoys, see AFM 55-30 ("Army Motor Transport Units and Operations"), or accompanying the military in battlefield operations, see AFM 3-100.21 ("Contractors on the Battlefield"). Additional regulations are to be found in various Department of Defense Instructions. See, e.g., DoDI 3020.41 "Contractor Personnel Authorized to Accompany the U.S. Armed Forces." Finally, the individual LOGCAP contract between the military and KBR -- along with the Statements of Work (SOW) and Task Orders (TO) by which the contract is implemented -- contain still further provisions that clarify the parties' respective duties and responsibilities.

These convoy missions were highly dangerous: they unavoidably involved traveling through war zones, frequently exposing them to insurgent attacks in the form of improvised explosive devices ("IEDs"), small-arms fire, as well as shelling and rocket attacks. [Brocket Dep. 111:3-10]. Indeed, in the two months prior to the May 22 convoy, insurgent attacks had become so severe that convoy missions had been temporarily suspended. [Brocket Dep. 109-12.] As a result, military bases faced fuel shortages, requiring many of them to begin depleting their reserves. [Brocket Dep. 112:5-19]. In light of the urgent need for fuel, the military decided to proceed with the convoy despite the many risks.

Given the inherent dangerousness of these missions, the convoys were heavily militarized. Thus, military gun trucks and Humvees were interspersed among the KBR-operated fuel tankers in convoys. [Brocket Dep. 129: 15-24]. In addition, military escorts such as Sergeant Carmichael, were assigned to ride in the tanker trucks. [Tucker Decl. ¶ 10].

The missions were led by a military convoy commander, or "C-2," in accordance with strict military regulations.[3] We discuss these regulations in more detail below. For present purposes, it suffices to note that, as the district court found, the regulations give the military "plenary control" over convoys such as the

_____

[3] In addition to the military convoy commander, KBR received additional information and briefing from a KBR convoy commander, who also traveled in the convoy.

4

one at issue here.  Carmichael v. Kellogg, Brown & Root Services, Inc., 564 F.

Supp. 2d 1363, 1368 (N.D. Ga. 2008) ("Carmichael II").[4]  Thus, for example, it is

the military, not civilian contractors, that decides when convoys are to be arranged,

the routes to be traveled, the amount of fuel or other supplies to be transported, the

speed at which the vehicles are to travel, the number of vehicles to be included in

the convoy, the spacing to be maintained between the vehicles, and the security

measures to be employed, and other details of the mission.[5]

     Prior to departing on May 22, 2004, the military convoy commander

---

[4] Army Regulation 715-9 provides that "contractor employees will be expected to adhere to all guidance and obey all instructions and general orders issued by the Theater Commander." Army Reg. 719-5 at 3-2(f).  In the event that military orders are violated, Regulation 715-9 gives the military the authority to "limit access to facilities and/or revoke any special status a contractor employee has as an individual accompanying the force," and, indeed, to "demand that the contractor replace the individual."  Id.; see also Task Order 59, DE #94 at 00021 ("[KBR] is permitted to deploy its own personnel with prior approval of the Government and will comply with all deployment requirements for the specific Area of Operations.  The contractor shall be responsible for compliance with all requirements and guidance found in the 'Contractor Deployment Guide.'").

[5] In fact, the Army Field Manual sets forth instructions governing virtually every imaginable aspect of convoy operations, including the responsibilities of the advance/quartering party (i.e., parties in charge of coordinating convoys' arrivals at their destinations); convoy control personnel; start points and release points; "halts" (when the convoy stops for rest, personal comfort and relief, messing, refueling, maintenance, etc.); inspection of equipment, schedule adjustments; gaps and march rate; submission of movement bids (a request for clearance to move on a controlled route); communications; route reconnaissance; necessary escort and security measures.  See FM 55-30 at 5-1 to 5-7.  For example, FM 55-30 describes in detail the duties of the various personnel who participate in convoys (commander, platoon leader, truckmaster, etc.), id. at 2-1 to 2-7; various aspects of the "operational environment" (e.g., geography, terrain, weather, infrastructures, and threats) and the measures that should be taken under various circumstances; organization, id. at 3-4 to 3-5; vehicle placement, planning, id. at 5-1; maintenance, id. at 9-1, 9-2; defensive tactics for scenarios running from air attacks to nuclear attacks, id. at 6-1 to 6-5.

informed those participating in the convoy of these and other details concerning the mission. The speed of the convoy was set by the military convoy commander at between 50 and 60 miles per hour, and drivers were instructed to maintain a distance of 100 meters between their vehicles and the vehicles in front of them. Indeed, each vehicle was instructed to follow in the tire tracks of the vehicle ahead of it. Moreover, the military commander explained that the mission was to travel along a roadway referred to as "ASR Phoenix." The route was dreaded by convoy drivers: it was difficult to navigate because of its serpentine path and the poor quality of its surface, and additionally, was the site of frequent insurgent attacks, some of which had resulted in both military and KBR casualties. [Hansen Decl. ¶ 6; Gardner Dep. 35-37 (noting tension among employees resulting from an attack on a convoy roughly one month before Irvine's accident); cf. Lane v. Halliburton, 529 F.3d 548, 555 (5th Cir. 2008) (describing claims by KBR truck drivers who alleged that KBR failed to inform them that the convoys in which they were to travel were "subject to a very high risk of insurgent attack")]. In fact, the convoy's departure on that morning was delayed because an IED had been discovered by a previous convoy and had to be detonated. [Brocket Dep. 19:3-15]. Although plagued with these dangers, the military nonetheless chose ASR Phoenix because it was safer than alterative routes, which, for example, would have required the

6

convoy to travel through Baghdad's industrial district, a particularly dangerous route. [Stonebraker Dep. 147:18-24].

On the day of the accident, the convoy left Camp Anaconda between 7:00 a.m. and 9:00 a.m. The procession included roughly fifteen tankers. [Irvine Dep. 82:13-21]. Given the threat level, the military had recently limited the number of commercial vehicles to fifteen per convoy. [Lange Dep. 22:21-25]. Like most convoys, the May 22 convoy was heavily militarized. Interspersed between the tankers were approximately seven military gun trucks. [Brocket Dep. 129:17-24]. The vehicles followed in a single-file line behind the military convoy commander. The sixth tanker was driven by David Irvine.[6] [Irvine Dep. 82:18]. Hired by KBR in April 2004, this was approximately Irvine's fifth or sixth convoy, Irvine Dep. 72:21, and he had traveled this particular route on approximately three previous occasions.[7] Irvine's truck was carrying the maximum load, approximately 8,000 gallons of fuel, weighing roughly 80,000 pounds. Irvine Dep. 88:3-89:17. The

---

[6] There is some ambiguity in the record concerning Irvine's place in the convoy. This is because different witnesses counted the position differently depending on whether their counts included only KBR vehicles, or included military vehicles as well. [See, e.g., Brocket Dep. 44:21-45:5].

[7] Irvine first applied for a job with KBR in January 2004, but was turned down after he failed a medical exam due to "erratic" blood pressure. He began taking medication for the condition, and after reapplying a few months later, was hired by KBR to operate the tractor-trailers used by the military to transport fuel for its operations in Iraq. He was sixty-six years old when he was hired. [Irvine Dep. 6:8-9].

military commander assigned Sergeant Carmichael as a military escort -- or a "shooter," as they are called -- to ride in Irvine's vehicle.

After traveling for several hours, the convoy approached ASR Phoenix's first set of dangerous "S-curves." The military gun truck at the head of the convoy alerted the other vehicles via radio that the curves lay ahead. Each of the vehicles traveling ahead of Irvine's successfully negotiated the turns. Irvine made it through the first curve of the S, but as he turned to enter the second curve, the tanker's rear end veered off the road, eventually causing the vehicle to roll over.

After the accident, Irvine was found in the truck, dangling from his seat belt without having sustained serious injury. However, Sergeant Carmichael was thrown from the vehicle and partially pinned beneath it. Rescuers were able to dislodge Sergeant Carmichael after roughly six or seven minutes, and both he and Irvine were subsequently evacuated from the scene by medical personnel. Tragically, Sergeant Carmichael had suffered severe brain injuries due to a lack of oxygen. He has remained in a permanent vegetative state ever since.

Due to the accident, the convoy was halted for roughly ninety minutes. During that time, the convoy encountered no hostile activity. Pursuant to military regulations, the overturned vehicle was set afire and destroyed. The remaining vehicles continued on to Al Asad. Notably, later on in the journey, an IED

8

damaged one of the vehicles and injured a KBR employee. [Brocket Dep. 125:4-13]. [8]

## B.     Procedural History

On February 1, 2006, Sergeant Carmichael's wife filed suit, individually, and as her husband's guardian, against KBR, Halliburton, and Irvine in Georgia state court. The complaint asserted that Irvine had been negligent in, among other things, traveling at an excessive speed under the circumstances, failing to keep a proper lookout, and in failing to inspect his vehicle before operating it. In addition, the complaint sought to hold KBR and Halliburton liable for Irvine's negligence under the doctrine of respondeat superior. Finally, the complaint alleged that KBR was liable for negligent hiring, supervision, training, and retention, as well as for negligently entrusting the vehicle to Irvine, and for "all other acts of negligence as may be shown at trial." Compl. ¶ 25.

In March 2006, KBR removed the case to the United States District Court for the Northern District of Georgia, and filed a motion to dismiss based, inter alia,

---

[8] After the accident, KBR convened a Post Accident Review Board to investigate the events leading up to the rollover. The Board found that the "rollover incident resulted from Irvine traveling at an excessive speed while negotiating a curve [and] not paying attention to surroundings." Initially, the Board recommended that Irvine be allowed to return to driving tankers after a brief suspension. However, a KBR Deputy Project Manager concluded that stricter discipline was warranted and ordered that Irvine be permanently removed from driving duties. Another report submitted by a KBR transportation foreman determined that the cause of the accident was Irvine's failure to control the vehicle.

on the political question doctrine. The district court denied the motion, concluding that it was too soon to tell whether the suit would raise political questions. Carmichael v. Kellogg, Brown & Root Services, Inc., 450 F. Supp. 2d 1373, 1381 (N.D. Ga. 2006) ("Carmichael I").

After completion of discovery, KBR again moved to dismiss on political question grounds. The district court carefully examined all of the evidence and, this time, concluded that the suit raised political questions. Carmichael II, 564 F. Supp. 2d at 1372. Specifically, the district court concluded that since "the army did in fact control every aspect of the organization, planning and execution of the convoy in question . . . the conduct of the military and its handling of supply convoys used to support military operations would necessarily be questioned were this case allowed to go forward." Id. at 1368. In addition, the court determined that given the highly unusual circumstances under which the accident occurred -- particularly, the fact that the "rollover took place on a route notorious for lethal insurgent activity while Irvine helped to transport jet fuel from one military camp to another as part of [a] convoy" -- there were "no judicially discoverable and manageable standards for resolving Plaintiffs claims." Id. at 1371. Accordingly, the district court concluded that the suit presented political questions over which it could not exercise jurisdiction, and dismissed the suit for lack of subject-matter

10

jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Id. at 1372.

## II. DISCUSSION

### A. Standard of Review

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction can be asserted on either facial or factual grounds. Morrison v. Amway Corp., 323 F.3d 920, 925 n.5 (11th Cir. 2003). Facial challenges to subject matter jurisdiction are based solely on the allegations in the complaint. When considering such challenges, the court must, as with a Rule 12(b)(6) motion, take the complaint's allegations as true. Id. However, where a defendant raises a factual attack on subject matter jurisdiction, the district court may consider extrinsic evidence such as deposition testimony and affidavits. Id. KBR's renewed Rule 12(b)(1) motion specifically appealed to jurisdictional evidence obtained during discovery. As a result, the district court correctly observed that it was free to weigh the facts and was not constrained to view them in the light most favorable to Carmichael. Carmichael II, 564 F. Supp. 2d at 1365.

We review the district court's legal conclusions de novo and its factual findings for clear error. Lawrence v. Dunbar, 919 F.2d 1525, 1530 (11th Cir. 1990) ("The usual standard of reviewing a district court's findings of jurisdictional

11

facts is the clearly erroneous standard."); see also Aurecchione v. Schoolman Transp. Sys., Inc., 426 F.3d 635, 638 (2d Cir. 2005). As we have repeatedly held, the "clearly erroneous" standard is highly deferential. See, e.g., Renteria-Marin v. Ag-Mart Produce, Inc., 537 F.3d 1321, 1324 (11th Cir. 2008). On review for clear error, the district court's determination must be affirmed "so long as it is plausible in light of the record viewed in its entirety." Merrill Stevens Dry Dock Co. v. M/V YEOCOMICO II, 329 F.3d 809, 816 (11th Cir. 2003) (quotation marks omitted); see also University of Georgia Athletic Ass'n v. Laite, 756 F.2d 1535, 1543 (11th Cir. 1985) ("While the 'clearly erroneous' standard of review is less stringent than the well-known sports rule, 'The referee is always right,' it nevertheless presents a formidable challenge to appellants who . . . seek to overturn the factual findings of a district court.").

## B.    The Political Question Doctrine

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. American Cetacean Soc., 478 U.S. 221, 230 (1986). Political questions "have been held to be nonjusticiable and therefore not a 'case or controversy' as defined by Article III." Occidental of

12

Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard Tanker Dauntless Colocotronis, 577 F.2d 1196, 1203 (5th Cir. 1978); see also Massachusetts v. E.P.A., 549 U.S. 497, 516 (2007) ("It is therefore familiar learning that no justiciable 'controversy' exists when parties seek adjudication of a political question[.]"); Made in the USA Found. v. United States, 242 F.3d 1300, 1312 (11th Cir. 2001) ("The political question doctrine emerges out of Article III's case or controversy requirement and has its roots in separation of powers concerns.").

In Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court outlined a familiar list of factors to be used in determining whether a dispute raises a non-justiciable political question. Specifically, under Baker a case may be dismissed on political question grounds only if at least one of the following characteristics is present:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] a lack of judicially discoverable and manageable standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Aktepe v. United States, 105 F.3d 1400, 1402-03 (11th Cir. 1997).

13

Here, the district court found that both the first and second Baker factors applied to Carmichael's suit. Specifically, the court determined that adjudicating the dispute would require reexamination of the type of sensitive military judgments and decisions typically insulated from judicial review and that it was without judicially manageable standards for doing so. We examine each of these issues separately and conclude that the district court was correct in reaching both conclusions.

## C. A Textually Demonstrable Constitutional Commitment to a Coordinate Political Department

### 1.

Under Baker's first factor, a political question is raised when a suit requires reexamination of issues entrusted by the Constitution's text to a coordinate political department. Baker, 369 U.S. at 217. "This factor recognizes that, under the separation of powers, certain decisions have been exclusively committed to the legislative and executive branches of the federal government, and are therefore not subject to judicial review." McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1358-59 (11th Cir. 2007). There can be little doubt that military judgments generally fall into this category. Article I of the United States Constitution gives Congress the power to declare war and to provide for, organize, arm, maintain, and govern the military. U.S. Const. art. I, § 8, cls. 11-16. Likewise, Article II of the

14

Constitution makes the President the Commander-in-Chief of the armed forces. U.S. Const. art. II, § 2; see also McMahon, 502 F.3d at 1359 (noting that "the text of the Constitution explicitly invests the political branches with authority over the military"); Aktepe, 105 F.3d at 1403 ("The Constitution emphatically confers authority over the military upon the executive and legislative branches of government.").

This is not to say that all cases involving the military are automatically foreclosed by the political question doctrine. See, e.g., McMahon, 502 F.3d at 1358 ("Nevertheless, it is clear that not even military judgments are completely immune from judicial review."); see also Gilligan v. Morgan, 413 U.S. 1, 11-12 (1973) ("[W]e neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law for specific unlawful conduct by military personnel."). Rather, determining whether the doctrine applies requires a "discriminating analysis of the particular question posed, in terms of the history of its management by the political branches, of its susceptibility to judicial handling in the light of its nature and posture in the specific case, and of the possible consequences of judicial action." Baker, 369 U.S. at 211-12. The court "must analyze [an] appellant's claim as it would be tried, to determine whether a political question will emerge."

15

Occidental, 577 F.2d at 1201-02.

The district court in this case concluded that Carmichael's suit would require reexamination of many sensitive judgments and decisions entrusted to the military in a time of war. We agree. As we have recounted, military judgments governed the planning and execution of virtually every aspect of the convoy in which Sergeant Carmichael was injured. At the broadest level, these include the military's decision to utilize civilian contractors in conducting the war in Iraq, and its decision to use the contractors specifically in connection with fuel-transportation missions such as the one at issue here. The rollover in which Sergeant Carmichael was injured never would have taken place if these basic decisions had not been made.

Moreover, and more precisely in relation to the May 22, 2004 convoy, the military decided the particular date and time for the convoy's departure; the speed at which the convoy was to travel; the decision to travel along a particular route (ASR Phoenix); how much fuel was to be transported; the number of trucks necessary for the task; the speed at which the vehicles would travel; the distance to be maintained between vehicles; and the security measures that were to be taken. Each of these critical determinations was made exclusively by the military. [Culver Decl. ¶ 10. ("Under the SOW in Task Orders 43 and 59, the Army exclusively

16

decided whether, when, and along what route to deploy a convoy, as well as determining the speed of the convoy, the distance between convoy vehicles, and all other conduct intended to avoid danger and minimize risks.") (emphasis added); see also Holm Decl. ¶ 7 (citing Army Field Manual 55-30 and averring that the "Army is responsible for all aspects of the control, organization, and planning of supply convoy operations") (emphasis added); Hansen Decl. ¶ 10; see generally Army Reg. 715-9 (establishing "Department of the Army policies, responsibilities, and procedures for using contractors on the battlefield, and specifically addresses planning for acquiring and administering commercial support services on the battlefield")].

Furthermore, each of these decisions required the specific exercise of military expertise and judgment. This comes sharply into view when we consider the circumstances surrounding the May 22, 2004 mission. As the district court found, ASR Phoenix was a particularly treacherous roadway: it was narrow, ridden with potholes, marked by numerous curves, and, most of all, was a favored target of insurgent activity. Carmichael II, 564 F. Supp. 2d at 1370. [see also Holm Decl. ¶ 9 ("ASR Phoenix, like most convoy routes, is very narrow, has a poorly maintained road surface, and has numerous potholes and other damage from IEDs and other munitions. The Army uses such roads because there are either no better

alternative routes or because the threat conditions on alternative routes render them unsafe for convoy passage.")].

In the face of these difficult military conditions, traveling on ASR Phoenix called for delicately-calibrated decisions based on military judgment, experience, and intelligence-gathering. Thus, in making the judgment to organize the convoy in the first place, it was necessary for the military to calibrate the risks associated with the mission and to balance those risks against its basic need for fuel. Army regulations make clear that the decision to use civilian contractors instead of military personnel for particular tasks calls for delicate balancing of considerations such as risk and efficiency. See, e.g., Army Reg. 700-137 at 2-4 ("The use of civilian contractors versus U.S. military personnel involves a higher degree of risk. Contractor employees have supported the Army in overseas locations during previous crises and can provide continued support in the future. However, their performance cannot be accurately predicted. [Commanders] must evaluate each function, define the acceptable degree of risk, and balance its military and contractor support mix accordingly.").

Moreover, once the decision to conduct the convoy had been made, the military made numerous notable tactical determinations concerning how the mission could most safely be executed. A balance had to be struck so that the

vehicles would be traveling swiftly enough to frustrate potential insurgent attacks, but not so fast that drivers would be unable to control their vehicles on the narrow, wandering, poorly-maintained road. Similarly, as the district court observed, it was necessary for the vehicles to maintain enough distance between one another to avoid becoming a condensed target for insurgent attacks, but not so far apart as to lose artillery cover. Carmichael II, 564 F. Supp. 2d at 1370. There is not the slightest hint in the record suggesting that KBR played even the most minor role in making any of these essential decisions.

Because the circumstances under which the accident took place were so thoroughly pervaded by military judgments and decisions, it would be impossible to make any determination regarding Irvine's or KBR's negligence without bringing those essential military judgments and decisions under searching judicial scrutiny. Yet it is precisely this kind of scrutiny that the political question doctrine forbids. The district court properly found that Carmichael's suit is non-justiciable.

2.

Carmichael advances several arguments in an attempt to forestall this conclusion. First, she claims, despite overwhelming evidence to the contrary, that it was in fact KBR, and not the military, that exercised control over the convoy. In support of this contention, she cites a document she refers to as KBR's "Convoy

Commander Book for Camp Anaconda." According to Carmichael, the book states that the KBR Convoy Commander, not the military convoy commander, exercises "main control" over the convoy. [Blue Br. at 5 n.1].

This argument is a non-starter, however, because the "Commander Book" is not part of the record. In ruling on KBR's renewed motion to dismiss, the district court refused to consider the book because it had not been properly authenticated. Carmichael II, 564 F. Supp. 2d at 1370. Carmichael insists that the district court erred in excluding the book, claiming that the document had been authenticated by the deposition testimony of Robert Stonebraker, a KBR Convoy Commander. Yet Carmichael fails to cite any specific portion of Stonebraker's testimony in support of this claim. Indeed, she raises the issue of authentication only briefly and in a footnote to her brief on appeal. Because she has failed to develop the argument or to offer any citation to the record in support of it, we deem the argument waived. Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (issue waived because insufficiently developed in briefs on appeal).[9]

_____

[9] But, even if we were to consider the book, it would provide Carmichael with precious little help. The commander "book" is in fact a ten-page document that more resembles an outline, consisting mostly of headings and bullet points, than a formal manual of any sort. It is true that in one place (under the heading "Convoy Control Personnel"), the document states: "The main control is exercised by the convoy commander." [DE #97, Ex. 16 at 6.] However, this statement is much too cryptic -- particularly in light of the elliptical nature of the commander book as a whole -- to provide any evidence of KBR's control over the convoys. Indeed, it is not even clear whether the sentence in question refers to KBR's or the military's convoy commanders.

In any event, the notion that KBR exercised any significant control over military convoys -- let alone "main" control -- is completely implausible in light of the mountain of evidence to the contrary. [See, e.g., Carmichael II, 564 F. Supp. 2d at 1369 n.6; Shack Dep. 68:15-18; Brocket Dep. 128:22-25; cf. Whitaker v. Kellogg Brown & Root, Inc., 444 F. Supp. 2d 1277, 1278-79 (M.D. Ga. 2006)]. The military regulations make abundantly clear that KBR was answerable to the military, and was expected to abide by military orders, policies, and requirements. See Army Reg. 715-9 at 3-2(f) (stating that contractor employees are "not under the direct supervision of military personnel in the chain of command," but that the "contracting officer . . . or [his] designated liaison . . . is responsible for monitoring and implementing contractor performance requirements"). In the event that military orders are violated, Regulation 715-9 gives the military the authority to "limit access to facilities and/or revoke any special status a contractor employee has as an individual accompanying the force," and to "demand that the contractor replace the individual." Id.; [see also Task Order 59, DE #94, Ex. 5 at 00021 ("[KBR] is permitted to deploy its own personnel with prior approval from the Government and will comply with all deployment requirements for the specific Area of Operations. The contractor shall be responsible for compliance with all requirements and guidance found in . . . [the] 'Contractor Deployment Guide.'")].

21

The testimony of both Army and KBR personnel also leaves no doubt that both parties understood fully the military's complete control over military convoys. [See, e.g., Hansen Decl. ¶ 10 ("The military convoy commander was in total command and control of the convoy, including setting the speed at which the convoy traveled. The military convoy commander had the sole authority to initiate tactical measures relating to the convoy, including adjusting the convoy speed[.]"); Shack Dep. 68:15-18 (testifying that "it was very clear to everybody and everybody at KBR that the military -- and still is -- that the military is in charge of all convoys outside the wire."); Brocket Dep. 128:22-25 ("[E]very move, everything we do from the point that we link up with the military and we began this mission, everything we do is dictated by the military C-2 [i.e. military convoy commander.]")].

In addition to the commander book, Carmichael cites various statements in the record in an attempt to support her claim that it was KBR, not the military, that ultimately had control over the convoy. For example, she emphasizes the fact that Irvine and other KBR drivers took their orders from the KBR convoy commander instead of the military convoy commander. But the fact that the military's orders were communicated through KBR does not mean that KBR had any authority over the convoy; it simply shows that, rather than giving orders directly to Irvine and

22

other drivers, the military transmitted its orders by using KBR's management as a conduit. Nor do we find relevant Carmichael's claim that KBR's commanders occasionally gave military drivers instructions about what road to take or where to turn. Even if true, this does not suggest that KBR made any decisions about the route that convoys were to take; the speed; or the convoy configuration. At most, it shows only that KBR sometimes helped drivers carry out the directions that had been decided upon by the military.

Carmichael also claims that it was Irvine, not the military, who ultimately controlled his vehicle. She argues, for example, that regardless of what the military regulations might have required, Irvine was responsible for steering the vehicle and controlling its speed. If he had wished, Carmichael claims, Irvine could have slowed down, or even come to a stop, as he approached the S-curve.[10] But this argument amounts to little more than a play on the words "control" and "responsibility." The fact that Irvine had physical control over his tanker does not change the fact that he was operating at all times under orders and determinations

_____

[10] In a similar vein, Carmichael points out that "there is nothing the military does to lock in the speed of each individual truck." [Blue Br. at 7]. Precisely what is meant by "locking in" here is not entirely clear, but the underlying claim is apparent: it was individual drivers such as Irvine, not the military, who had control over the vehicles in the convoy. As we have explained, that Irvine had "control" over his vehicle in this sense is beside the point. The fact remains that Irvine's conduct was at all times governed by military rules and regulations (including timing, route, speed, and spacing), and any attempt to assess the reasonableness of Irvine's conduct would entail an examination of those rules and regulations.

made by the military. To be sure, Irvine could have flouted the military's orders; but to have done so would have been to risk disruption of the entire convoy. Indeed, any defense mounted by KBR or Irvine would undoubtedly cite the military's orders as the reason why Irvine did not reduce his speed.

In short, we are not persuaded by Carmichael's claims that the political question doctrine does not apply here because of the fact that KBR or Irvine, and not the military, were somehow in control of the convoy or the individual vehicles within it.

3.

Taking a slightly different tack, Carmichael argues next that even if her suit in some way implicates military judgments, no political question problem arises because adjudicating the case would not require the court to review any of those military judgments. According to Carmichael, this is because the record clearly establishes that Irvine's negligence alone caused the accident. Thus, for example, she notes that Irvine's was the only vehicle in the convoy to have rolled over. She also makes much of the fact that KBR's subsequent investigation points to Irvine alone as the cause of the accident. In addition, Carmichael cites Irvine's time cards, which show, she claims, that Irvine worked in excess of eighty hours per week in the weeks leading up to the accident, suggesting that overwork or fatigue

might have affected Irvine's judgment or ability to drive safely.

We remain unpersuaded. To begin with, even if we were to assume that all of Carmichael's assertions on this point are true, Carmichael has not come close to showing that Irvine <u>alone</u> was responsible for the accident. The fact that KBR's investigation mentions only Irvine's conduct does not establish that Irvine was the sole cause of the accident. The record does not indicate anything about the quality or thoroughness of KBR's investigation.[11] And even if KBR had found evidence strongly suggesting that military decisions played a causal role in the accident, KBR might nonetheless have opted against implicating the military for ulterior reasons.

Likewise, we find little significance in the fact that Irvine's was the only vehicle involved in the accident. Carmichael argues that since all convoy drivers were instructed to follow exactly the same path, and since none of the vehicles ahead of Irvine crashed, Irvine should not have crashed if he had been driving as instructed. We find this argument much too facile. Given the multiple hazards

---

[11] Similarly, we are unimpressed by Irvine's failure to blame the military for the accident. We have no reason for thinking that Irvine's judgment should be considered authoritative; and even if Irvine were correct in placing no blame on the military, it does not follow that either he or KBR must be blamed. It would be entirely plausible on this record for a jury to conclude that no one was at fault for the accident.

present -- e.g., ASR Phoenix's dilapidated condition, the presence of oil slicks,[12] and the speed set by the military commander -- the rollover might have been caused by any number of factors entirely beyond Irvine's control.

Furthermore, Carmichael's reliance on Irvine's time cards is misplaced. During his deposition, Irvine clarified that the time cards reflected twelve hours of pay each day, not twelve hours of work.  [Irvine Dep. 191:17-19].  He explained that the twelve hours included "probably a lot of bunker time at night." [Irvine Dep. 191:15-16].  Moreover, Irvine testified that much of his work consisted of tasks such as helping unload mail and washing his boss's car. [Irvine Dep.  282:19-25].  He estimated that only twenty of the hours indicated on his time card had been spent driving in a convoy that week. [Irvine Dep. 282:11-14].  The figures shown on Irvine's time cards do not establish whether Irvine was exhausted at the time of the May 22 convoy, and do not explain what role, if any, that purported exhaustion might have played in the accident.

Finally, even assuming that Irvine bore some blame for the accident, none of the facts cited by Carmichael shows that Irvine would be the only party to blame.

---

[12] The district court found that ASR  Phoenix "often harbored oil slicks."  Carmichael II, 564 F. Supp. 2d at 1370.  The record contains conflicting evidence concerning the existence of oil slicks on the road.  While some witnesses testified that there were no oil slicks, see Stonebraker Dep. 60:12-25; Basham Dep. 20:7-11, one witness testified to having seen an oil slick at the very spot where Irvine's tanker left the road, see Brockett Dep. 37-38; 158:14-20. We do not find the district court's determination on this point to be clearly erroneous.

It remains perfectly plausible that the speed at which the convoy was traveling (to take just one factor), along a dangerous route chosen solely by the military, would have contributed to the rollover. Indeed, the record contains evidence supporting just this theory. John Hansen, a Staff Sergeant traveling ahead of Carmichael in the May 22 convoy, averred that his vehicle "jolted," causing his stomach to drop, at the same point in the S-curve where Irvine's tanker rolled over. [Hansen Decl. ¶ 9]. The driver of Hansen's vehicle then radioed the other vehicles to inform them of the potential hazard. [Id.] Notably, despite the warning, the military convoy commander did not reduce the convoy's speed or take any other precautions. [Id. ¶ 10]. Whatever evidence Carmichael would present in an effort to show Irvine's negligence, KBR would surely rely on Hansen's statements, among other things, to argue that the military convoy commander was negligent in setting too fast a pace along the particularly treacherous route for the convoy, and in specifically ignoring evidence to this effect.

It is also important to note that there is evidence in the record concerning whether Sergeant Carmichael was wearing a seat belt during the ride. [Irvine Dep. 86:13-87:1]. In fact, there is evidence suggesting that the military specifically instructed shooters such as Sergeant Carmichael not to wear their seat belts (since wearing the belts made it difficult for shooters to survey the terrain and take aim).

27

[See, e.g., Hansen Decl. ¶ 11].  This evidence, too, undeniably calls military actions and decisions into question and, equally clearly, would be part of KBR's defense if the case were to go forward.

Thus, a careful review of the record in this case cannot and does not establish that Irvine alone was responsible for the accident.  Indeed, based on the evidence before us, a reasonable jury could conclude that Irvine's fault for the accident was negligible or nonexistent.  Because the issue of liability remains contested, in litigating the suit KBR would inevitably (and not without a substantial evidential foundation) try to show that unsound military judgments and policies surrounding every aspect of the May 22 convoy were either supervening or concurrent causes of the accident.  Litigation involving these issues is undeniably foreclosed by the political question doctrine.

### 4.

Carmichael's final argument with respect to the first Baker factor is that even if her suit implicates military judgments, and even if her suit would entail scrutinizing and adjudicating those judgments in a federal court, the particular judgments in question are not of the kind traditionally insulated from judicial review.  We disagree.  The decisions at issue here were precisely the kinds of calculations calling specifically for military judgment, intelligence-gathering, and

experience: only the military was in a position to calibrate the need for moving JP-8 fuel from Camp Anaconda to Al Asad in a time of war; only the military could accurately assess the risks presented by the mission; only the military was in a position to meaningfully balance those risks in light of its broader strategies and objectives; and only the military possessed the competence to make the many critical tactical decisions concerning the safest and most efficacious way to conduct the convoy.

In arguing that her suit does not implicate judgments requiring any special military expertise, Carmichael says that the convoy was not engaged in the use of military force and that the rollover did not take place on a "battlefield" or in a "combat zone." Thus, she notes that the convoy did not come under attack at any point prior to the accident. She also notes that the convoy encountered no hostile activity for the ninety minutes following the accident during which the convoy was halted and Sergeant Carmichael was given medical attention. We remain unpersuaded.

As an initial matter, the area through which the convoy was traveling at the time of the accident can only be fairly characterized as a "battlefield" or a "combat zone." The fact that the convoy encountered no hostile activity immediately prior to or after the accident is of little moment. As we have already recounted, the

29

departure of Irvine's convoy was delayed because an IED had hindered the progress of a previous convoy over the very same route; and later in the mission, a KBR driver was injured when his vehicle triggered an IED. The record also demonstrates that in previous weeks, several convoys traveling the same route had been attacked by insurgents, and that the attacks had become so frequent that the military was forced to close ASR Phoenix during the previous month. [Brocket Dep. 109-112]. The presence during the convoy of multiple armed escorts such as Sergeant Carmichael himself, as well as the inclusion of several military gun trucks in the convoy, attests to the profound danger inherent in the undertaking. On this record, it is entirely appropriate to describe the rollover as having occurred on a "battlefield" or in a "combat zone."

The deeper problem with Carmichael's argument, however, is the implicit suggestion that a military decision is unreviewable only if it somehow pertains to battlefield or combat activities. While decisions relating to the latter issues are paradigmatically insulated from judicial review, it is neither necessary nor sufficient for purposes of the political question doctrine that military decisions relate to such matters. Rather, the political question doctrine has been deemed applicable to military training policies, see, e.g., Gilligan, 413 U.S. at 5-6 (suit was barred by political question doctrine because it entailed judicial review of

30

"training, weaponry and orders" of the Ohio National Guard); Aktepe, 105 F.3d at 1403 (political question doctrine precluded personal injury suit arising out of accidental missile firing during NATO training exercises because the "Constitution reserves to the legislative and executive branches responsibility for developing military training procedures that will ensure the combat effectiveness of our fighting forces"); conscription, Cooper v. United States, 403 F.2d 71, 74 (10th Cir. 1968) (issues regarding constitutionality of the Universal Military Training and Service Act presented a political question); and the location of military bases, Bancoult v. McNamara, 445 F.3d 427, 436 (D.C. Cir. 2006) (decision to establish a military base in particular area presented a political question). See also Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1031 (10th Cir. 2001) (political question doctrine precluded court from reviewing FAA's decision, made in consultation with the Department of Defense, that airspace was necessary for military training).

In short, there can be little doubt that the military decisions plainly drawn into issue today -- concerning how to safely deliver vital military supplies through hostile territory in war time -- are among the "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force" that are "essentially professional military judgments," Gilligan, 413 U.S. at

31

10, and that are properly insulated from judicial review. We conclude, therefore, that Carmichael's negligence claims satisfy the first Baker criterion and therefore implicate the political question doctrine. Accordingly, we affirm the district court's dismissal of Carmichael's negligence claims for lack of subject matter jurisdiction.

**D.    Judicially Discoverable and Manageable Standards for Resolving the Issues in the Case**

In addition to determining that the political question doctrine applied when these facts are measured against the first Baker factor, the district court also concluded that this case implicated the second of the factors enumerated by the Supreme Court in Baker v. Carr: the lack of any judicially discoverable and manageable standards for resolving the dispute. Again, we agree.

We begin by recalling that the claims in Carmichael's complaint sound in negligence. In Georgia,[13] as elsewhere, a typical negligence claim requires the plaintiff to show:

> (1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection

---

[13] The district court does not appear to have made any specific determination concerning the substantive law applicable to the dispute. We find it unnecessary to address the issue here as well since, given the uniformity of negligence law among the states, our analysis would remain the same regardless of which state's law applied. We assume here solely for purposes of discussion that Georgia law would apply.

32

between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.

Adventure Outdoors, Inc. v. Bloomberg, 552 F.3d 1290, 1297 (11th Cir. 2008) (quoting Bradley Ctr., Inc. v. Wessner, 296 S.E.2d 693, 695 (Ga. 1982)). Furthermore, under Georgia law, it is "well settled that there may be more than one proximate cause of an injury in cases involving the concurrent negligence of several actors." MCG Health, Inc. v. Barton, 647 S.E.2d 81, 88 (Ga. Ct. App. 2007) (quotation omitted). Two or more "tortfeasors may be found to have committed 'concurrent' acts of negligence whether or not they acted in concert or their acts of negligence occurred at the same time." Delson v. Georgia Dep't of Transp., 671 S.E.2d 190, 194 (Ga. Ct. App. 2008).

Given the circumstances under which the accident in this case took place, we are without any manageable standards for making reasoned determinations regarding these fundamental elements of negligence claims. For example, given the extent to which the convoy was subject to military regulation and control, the question of whether Irvine acted reasonably or breached the standard of care cannot be answered by reference to the standards used in ordinary tort cases. As the district court correctly explained, in determining whether the standard of care has been breached in this case, "the question . . . would not be what a reasonable

33

driver would have done, or even what a reasonable driver in a 'less than hospitable environment' would have done." Carmichael II, 564 F. Supp. 2d at 1372. Rather, "the question before the Court would be what a reasonable driver subject to military control over his exact speed and path would have done." Id. We do not face the question of whether the defendants drove a fuel truck unsafely, say, on Interstate I-95 between Miami, Florida and Savannah, Georgia. Simply put, we have no readily available judicial standard with which to answer this question.

Similarly, the dangerousness of the circumstances under which Irvine was driving also renders problematic any attempt to answer basic questions about duty and breach. The difficulty here is much the same as that noted in Whitaker v. Kellogg Brown & Root, Inc., 444 F. Supp. 2d 1277 (M.D. Ga. 2006), another suit against KBR involving a military convoy in Iraq. In Whitaker, a soldier was killed after his truck was hit by a KBR truck that was traveling in a military convoy. The court concluded that the political question doctrine barred a suit brought on the soldier's behalf. Among other things, the court held that there were no judicially discoverable and manageable standards for resolving the questions presented by the case. The court explained:

> While Plaintiffs' simplistic labeling of this case as a "garden variety road wreck" is superficially appealing, it ignores the true nature of the circumstances giving rise to this tragedy. This wreck occurred in a combat zone during wartime while Plaintiffs' son, along with his

34

> Supply and Transport Troop and a group of civilian contractors, transported supplies from one military camp to another. The convoy operation was planned by the military, which determined the placement of vehicles in the convoy, the speed of the convoy, and the distance between vehicles in the convoy. Clearly, these circumstances differ dramatically from driving on an interstate highway or county road in the United States without any constraints other than ordinary skill, judgment, and prudence. The question here is not just what a reasonable driver would do -- it is what a reasonable driver in a combat zone, subject to military regulations and orders, would do.

Id. at 1282.

The same reasoning applies here. In the typical negligence action, judges and juries are able to draw upon common sense and everyday experience in deciding whether the driver of a vehicle has acted reasonably. But these familiar touchstones have no purchase here, where any decision to slow down could well have jeopardized the entire military mission and could have made Irvine and other vehicles in the convoy more vulnerable to an insurgent attack.

Nor is the problem merely the lack of standards for assessing the reasonableness of Irvine's conduct. As our previous discussion makes clear, it would be impossible to ascertain Irvine's potential liability in connection with the rollover without determining the military's liability. Thus, for example, it would be necessary to ask whether the convoy's rate of speed was reasonable given the poor condition of a serpentine road and the threat of insurgent attacks; whether the circumstances warranted the presence of armed escorts; whether an escort should

35

have been assigned to Irvine's vehicle, given the fact that he had never driven with one before; and whether the military had properly trained Sergeant Carmichael concerning the use of his seat belt. These questions, and others like them, are critical for assessing whether the military might have been negligent and whether its negligence might have played a causal role in the accident. But these matters defy resolution by means of conventional judicial standards used in ordinary tort cases. As we have held before, courts "lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." Aktepe, 105 F.3d at 1404.

Carmichael contends, nevertheless, that no special standards are needed to resolve the dispute. Rather, she claims, the case can be adjudicated using the same rules and principles employed in ordinary negligence cases. Carmichael purports to cite several cases in support of her argument, but none of these is apposite. Carmichael relies most heavily on our recent decision in McMahon, in which we first discussed the application of the political question doctrine in the context of suits against a civilian contractor as opposed to a branch of the government, and in which we held that the plaintiffs' suit was not barred by the political question doctrine. If ordinary tort principles were deemed workable in those cases, Carmichael argues, they should be deemed workable here as well. Unfortunately,

36

Carmichael's reading of McMahon is flawed.

In McMahon, three American soldiers were killed when the plane that was transporting them crashed into a mountain in Afghanistan. The soldiers' families brought a wrongful death suit against Presidential Airways, the civilian corporation that the military had contracted with to provide air transportation and other services in connection with U.S. military efforts in Afghanistan. We held that the suit was not barred by the political question doctrine. Specifically, we held that the first Baker factor was not met because, based on the allegations in the plaintiffs' complaint, it was impossible to determine whether the suit would require reexamination of any decision falling within the military's discrete areas of responsibility. 502 F.3d at 1360. We also rejected the claim that the suit met the second Baker factor because it would require the application of unmanageable judicial standards. As we observed:

> We readily acknowledge that flying over Afghanistan during wartime is different from flying over Kansas on a sunny day. But this does not render the suit inherently non-justiciable. While the court may have to apply a standard of care to a flight conducted in a less than hospitable environment, that standard is not inherently unmanageable. The flexible standards of negligence law are well-equipped to handle varying fact situations. The case does not involve a sui generis situation such as military combat or training, where courts are incapable of developing judicially manageable standards.

Id. at 1362.

37

This case differs from McMahon in a number of critical respects. First, the relationship between the military and Presidential in McMahon differs markedly from the relationship between the military and KBR here. In McMahon, the military's authority and responsibility over Presidential's activity was limited and discrete. Consequently, there was no necessary reason for thinking that adjudicating the suit would require the court to review military decisions. Here, by contrast, the military's control over fuel-supply convoys was "plenary," Carmichael II, 564 F. Supp. 2d at 1368, thus ensuring that virtually any question concerning the convoy's mission would inevitably implicate military judgments.

In addition, the accident at issue in McMahon took place during a more or less routine airplane flight. McMahon never claimed that the military activities in Afghanistan were related in any way to the accident, McMahon, 502 F.3d at 1337 n.3, and the fact that the crash took place over Afghanistan during wartime was incidental. In Carmichael's suit, however, the military dimension of the underlying events is utterly central: the convoy's mission was to deliver fuel supplies necessary for military operations; the conditions under which the convoys traveled were not merely "inhospitable"; they were potentially life-threatening.

Finally, our holding in McMahon was merely provisional, turning in key part on the limited nature of the factual record in the case. Given the lack of

discovery in the case, we explained that it was simply too soon to tell whether the plaintiff's suit would implicate political questions. Id. at 1362. We expressly noted, however, that a different conclusion might be reached if the question were raised again after development of the record. Id. at 1362 n.31. By contrast, the record before us in this case has been fully developed, and based on our review of the record, it is completely evident that the suit would require us to review many basic questions traditionally entrusted to the military, and that we have no judicially manageable standards for adjudicating the issues in the case.

For largely the same reasons, Carmichael's reliance on the Fifth Circuit's decision in Lane is also misplaced. In Lane, KBR was sued by employees who had been injured by insurgent attacks while driving trucks in military convoys in Iraq. According to the plaintiffs, KBR told them that they would be "100% safe," and would never be required to work in war zones or combat areas. Lane, 529 F.3d at 554. The plaintiffs claimed that the job was much more dangerous than KBR had led them to believe. Accordingly, they asserted fraud and fraud-based claims such as deceit, fraud in the inducement, intentional concealment of material facts, intentional misrepresentation, and civil conspiracy to commit fraud. Id. at 555. In addition, some of the plaintiffs asserted negligence claims against KBR as well. KBR claimed that the suits were nonjusticiable on political question grounds. The

39

Fifth Circuit disagreed.

Despite its factual similarity to the present case, Lane is not instructive here. First, no discovery had been taken in the case. Hence, the court had a very limited factual record to rely upon in determining whether the suit would raise political questions. Thus, as in McMahon, the court's conclusion was preliminary, emphasizing that "the case needs further factual development before it can be known whether that doctrine is actually an impediment." Id. at 554. Moreover, the attack in Lane was essentially facial in nature, and the court accordingly viewed the complaint's allegations in the light most favorable to the plaintiffs. Id. at 557. Furthermore, the claims at issue in Lane were very different from those asserted here. As noted above, the Lane plaintiffs asserted both fraud-based claims and negligence claims. Although it easily concluded that it was too early to decide whether the political question doctrine applied to the fraud-based claims, the court regarded the negligence claims -- notwithstanding the undeveloped factual record in the case -- as "mov[ing] precariously close to implicating the political question doctrine." Id. at 567. Thus, Lane observed, as we did in McMahon, that "further factual development very well may demonstrate that the claims are barred." Id. In short, neither McMahon nor Lane supports Carmichael's contention that the political question doctrine is inapplicable here.

40

Nor are any of the other cases cited by Carmichael helpful to her case.  For example, Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44 (2d Cir. 1991), arose out of a hijacking and murder committed by the PLO aboard a cruise liner.  The family of the victim brought suit against the owner and operator of the vessel, who in turn impleaded the PLO.  The PLO moved to dismiss, citing, among other things, the political question doctrine.  The Second Circuit held that "the common law of tort provides clear and well-settled rules on which the district court can easily rely," and that, consequently, "this case does not require the court to render a decision in the absence of 'judicially discoverable and manageable standards.'" Id. at 49.  After considering the other Baker factors, the court held that the political question doctrine did not apply.

The facts in Klinghoffer plainly differ from those here.  The hijacking at issue in that case took place on board a cruise liner, not, as here, in the procession of a military convoy, trucking jet fuel between military base camps, in a military theater, in a time of war.  Thus, aside from the fact that the acts were committed by members of the PLO, the questions presented in Klinghoffer had no political significance.  The Second Circuit noted that the "PLO is a political organization that engenders strong feelings of both support and opposition, and that any

41

decision the district court enters will surely exacerbate the controversy surrounding the PLO's activities." Id. However, the court went on to observe that the doctrine "is one of 'political questions,' not one of 'political cases.'" Id. (quoting Baker, 369 U.S. at 217). Here, in contrast, the entire character of the events in question is affected by the military context in which they took place. Thus, even if common law tort principles could be applied to the claims alleged in Klinghoffer, there is no reason to think that they could be similarly applied here.

Finally, Carmichael's reliance on Koohi v. United States, 976 F.2d 1328 (9th Cir. 1992), is misplaced. There, the Ninth Circuit held that the political question doctrine did not bar a suit involving the downing of a civilian aircraft by a United States warship, despite the fact that the incident occurred during a military action. The court noted that a "key element" of its conclusion was the fact that the plaintiffs' suit sought only damages. The court explained that "[d]amage actions are particularly judicially manageable. By contrast, because the framing of injunctive relief may require the courts to engage in the type of operational decision-making beyond their competence and constitutionally committed to other branches, such suits are far more likely to implicate political questions." Id. at 1332. Carmichael claims that since she seeks only money damages, her suit, too, will have no impact on military policies, procedures, or the conduct of war. But

the critical point is not just whether the decision would affect military procedures. The question also is whether Carmichael's suit would require a court to issue a decision on matters for which it effectively lacks any rule of decision. As we have explained, this case would require the district court to do precisely that.

As with the first Baker factor, then, we agree with the district court's conclusion that the second Baker factor applies to Carmichael's suit. Since there are no readily ascertainable and judicially manageable standards to be used in determining or apportioning Irvine's, KBR's, and the military's respective degrees of liability, the district court correctly concluded that the political question doctrine applied and that the action must be dismissed for lack of subject-matter jurisdiction.

## E. Negligent Hiring, Training, Supervision, and Entrustment

Besides seeking to hold KBR vicariously liable for Irvine's alleged negligence, Carmichael also seeks to hold KBR primarily liable for its own negligence. Specifically, Carmichael's complaint asserts claims for negligent supervision, negligent training, negligent retention, and negligent entrustment. For several reasons, these claims fail.

As an initial matter, we believe that, of these claims, only Carmichael's negligent training and negligent supervision claims have been preserved on appeal.

43

Carmichael scarcely mentions the other claims, either in her briefing before the district court or on appeal. The "law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004). Giving Carmichael the benefit of the doubt, her discussion of the negligent training and negligent supervision claims, while minimal, are nevertheless sufficient to put these claims, and only these claims, properly before us.

Further, Carmichael's negligent training and negligent supervision claims are precluded by the political question doctrine. We first consider Carmichael's negligent training claim. Like the claims against Irvine, Carmichael's negligent training claim implicates both the first and second Baker factors.

First, the negligent training claim would entail judicial scrutiny of sensitive judgments customarily entrusted to the military. It is well settled that questions concerning military training have traditionally been insulated from judicial review. As the Supreme Court has observed, "[t]he complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches." Gilligan, 413 U.S. at 10. Indeed, the

44

Court has stated, "[i]t would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible -- as the Judicial Branch is not -- to the electoral process." Id.

Carmichael argues that her negligent training claim would not require judicial questioning of military judgments because Irvine's training was carried out entirely by KBR. For at least two reasons, however, we do not agree. As an initial matter, we are not convinced that none of Irvine's training was provided directly by the military. There is record evidence indicating that KBR's drivers received instruction regarding some techniques directly from the military. [See Brocket Dep. 139:13-140:9; 187:21-24 (stating that KBR drivers were taught a technique referred to as the "5-25 scan" by the military, which involves initially scanning the first five meters out from one's line of sight, and then scanning further out to twenty-five meters)].

The second and more thoroughgoing problem is that, even if the military never directly provided any of Irvine's training, the district court unambiguously found that KBR employees were trained according to military standards. Carmichael II, 564 F. Supp. 2d at 1368-69. Thus, the KBR instructors who trained Irvine were themselves trained by military personnel. Moreover, the materials

used in training KBR drivers were taken directly from the military's training manuals. Id. at 1371 n.7. [See, e.g., Shack Dep. 13-14 (stating that he provided KBR's managers and foremen with the same training material, such as that included in FM 21-305, used by the U.S. military); Brocket Dep. 116, 120 (stating that Army's training program was "adopted" by KBR and is still used by KBR today)]. Indeed, DoD regulations, as well as KBR's contract with the military, required that KBR be trained in accordance with military standards.[14] Given that Irvine's training was so deeply bound up with military regulations, we do not agree that Carmichael's negligent training claim could be litigated without subjecting military judgments and policies to the kind of scrutiny prohibited by the political question doctrine.

Similarly, we conclude that Carmichael's negligent training claim also implicates the second Baker factor. In addition to the fact that questions concerning military preparation and training have traditionally been entrusted to the executive and legislative branches, it is also well settled that courts lack judicially manageable standards for passing on such questions. Thus, in observing

_____

[14] See, e.g., DoDI 3020.41 at 6.2.7.9 (Oct. 5, 2005) ("Contracting activities, the Military Departments, and the DoD Components shall ensure any training requirements, including specific training requirements established by the geographic Combatant Commander, and training required according to [specific] DoD Directive[s]."); see also LOGCAP Contract at H-13, DE #94 Ex. 5 at 00002 ("The contractor shall comply, and shall ensure that all deployed employees, subcontractors, subcontractors employees, invitees and agents comply with pertinent Service and Department of Defense directives, policies, and procedures[.]").

46

that the "complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments," the Supreme Court noted that it was "difficult to conceive of an area of governmental activity in which the courts have less competence." Gilligan, 413 U.S. at 10. We have no readily available standards for assessing whether the training Irvine received was adequate to prepare him for the work he was to perform.

Finally, as with Carmichael's claim for negligent training, we conclude that her claim for negligent supervision also implicates the first and second Baker factors and thus is foreclosed by the political question doctrine. The issues of training and supervision are so closely related that we need do little more than reiterate the considerations made earlier. Like the matter of training, the supervision of personnel who participate in military operations clearly falls within the ambit of "[t]he complex subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches." Gilligan, 413 U.S. at 10. Carmichael contends that KBR alone was responsible for supervising the performance of employees such as Irvine. The pertinent regulations, however, do not support this

47

claim.

The Army Field Manual states that "[t]o fully integrate contractor support into the theater operational support structure, proper military oversight of contractors is imperative." FM 3-100.21 at 1-23. Moreover, as we have noted, the military retained ultimate authority to require the dismissal of any employee whose performance it found unacceptable.[15] Similarly, the parties' contract states that the "Contractor shall promptly resolve, to the satisfaction of the contracting officer, all contractor employee performance and conduct problems identified by the cognizant contracting officer or his/her designated representative." [LOGCAP Contract at H-13, DE #94 Ex. 5 at 00003]. In fact, the contract includes several pages of criteria and sub-criteria, setting forth in elaborate detail the performance standards against which KBR's performance was to be evaluated. [Id. at 13-17]. Furthermore, as the district court found, "[t]he military convoy commander is also responsible for inspecting personnel and vehicles in preparation for the convoy." Carmichael II, 564 F. Supp. 2d at 1369 n.6. To be sure, KBR had responsibility for supervising employees such as Irvine. Nevertheless, that authority plainly was not exclusive or absolute. Thus, the inquiry necessary to adjudicate Carmichael's

---

[15] See, e.g., Army Reg. 715-9 at 3-2(f) ("In the event instructions or orders of the Theater Commander are violated, the Theater Commander may limit access to facilities and/or revoke any special status a contractor employee has as an individual accompanying the force to include directing the Contracting Officer to demand that the contractor replace the individual.").

negligent supervision claim could not be cabined to KBR's supervisory practices, but would rather require examination of military policies and judgments.

The central problem remains that we are still required to reexamine crucial military decisions. While the specifics of Carmichael's negligent supervision claim are ill-defined and stated in only the briefest terms, to the extent that she claims that KBR's negligent supervision inhered in assigning Irvine to the May 22 convoy despite his purported exhaustion, this explains precisely why the claim is barred by the political question doctrine. This claim would undeniably require Carmichael to show that Irvine's driving was the sole cause of the accident, that Irvine's poor driving was due to fatigue, and that Irvine's fatigue was the result of KBR's supervisory practices. For the many reasons that we have already indicated, however, none of these determinations could possibly be made without also reviewing many sensitive military judgments and policies. Thus, and perhaps most importantly, it would be impossible to determine that Irvine's driving alone was the sole cause of the accident or to possibly apportion blame without ruling out the potential causal role played by pivotal military judgments, including: (1) the initial decision to transfer the fuel by means of a land convoy; (2) the route the military convoy was required to travel; (3) the timing of the convoy; (4) the speed at which it was required by the military to travel; (5) the spacing between the

49

vehicles; (6) the nature and size of the military support accompanying the convoy; and (7) Sergeant Carmichael's duties and responsibilities as a shooter. Moreover, it would be impossible to determine that Irvine's purported exhaustion was due entirely to KBR's negligent supervision or to assess the reasonableness of KBR's supervisory policies without at the same time necessarily assessing the military's supervisory policies as well. As we have explained, the military's supervisory policies were deeply intertwined with KBR's.

Nor, finally, can we discern any readily available standards by which to answer such questions regarding supervisory matters. In the context of an ordinary employer-employee relationship, courts are perfectly capable of fashioning and applying standards for determining the adequacy of an employer's supervisory practices. Given the military nature of the work at issue in this case, however, ordinary criteria are no longer useful. Courts are simply not equipped to pass judgment on the degree of supervision appropriately exercised over personnel charged with performing the tasks Irvine was charged with performing, nor on the standards according to which his performance should be judged.

In short, we conclude that Carmichael's negligent training and supervision claims must be dismissed, since these, like her other claims, inevitably would raise political questions prohibited by the first and second Baker factors.

50

### III. CONCLUSION

The accident in which Sergeant Carmichael was grievously injured can only be considered a tragedy. Nevertheless, we are without the power to inquire into who or what might have been responsible for the tragedy. To do so inevitably would require us to address matters that have been definitively entrusted to other branches of the government, and to adjudicate questions that defy resolution by any judicially manageable standards. That courts are forbidden from addressing such political questions is fundamental to the separation of powers on which our system of government is based, and we are constrained to adhere to that principle no matter how deeply we may sympathize with the plaintiff in the case. Accordingly, we affirm the district court's dismissal of Carmichael's suit for lack of subject-matter jurisdiction.

**AFFIRMED.**

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

The district court, in making its jurisdictional determination, found that the military "did in fact control every aspect of the organization, planning and execution of the convoy in question" including the training of the drivers, the route and speed of the convoy, and that the military even ordered each vehicle in the convoy to follow "a prescribed distance behind and exactly in the tire tracks of the vehicle in front of it." Based on these factual findings – which I agree are not clearly erroneous – I concur in the majority's conclusion that a court can not consider the individual negligence of the driver in this case without reexamining sensitive military decisions. Accordingly, I agree that the negligence claims against the driver and the claims against KBR which are dependent upon a finding of driver negligence are barred by the political question doctrine.

I respectfully dissent, however, because in my view Plaintiffs have sufficiently alleged a claim of negligent supervision based on their allegation that KBR breached the requisite duty of care by requiring its driver to work unreasonably long hours, causing driver fatigue, which was a proximate cause of the injury. In its otherwise thorough order, the district court made no factual finding as to whether the military was involved in setting the drivers' work schedules or was responsible for selecting specific drivers for its missions. The

52

record is therefore insufficient, in my opinion, to determine whether consideration of the negligent supervision claim would require the reexamination of a military decision. For this reason, I would remand the matter to the district court for further factual findings on this jurisdictional question.

As an initial matter, I disagree with the majority's conclusion that consideration of the negligent supervision claim "would undeniably require Carmichael to show that Irvine's driving was the sole cause of the accident." Supra, at Section II.E. It is true that where the sole proximate cause of the alleged injury is the negligence of the employee, to find the employer liable it must first be found that the employee was negligent as charged. Under Georgia law, however, if the negligence of the employer has caused the driver-employee to be fatigued and physically unfit to perform his job, and this fatigue is the proximate cause of the accident, the employer may be found negligent even without a corresponding finding that the driver was negligent. In Reliable Transfer Co. v. Gabriel, 65 S.E.2d 679 (Ga. Ct. App. 1951), the Georgia Court of Appeals upheld a verdict against an employer, who was liable for his negligence in permitting his co-defendant-driver to operate his truck continuously for longer hours than was permitted by a rule of the Interstate Commerce Commission ("ICC"), despite the fact that the jury found that the driver was not negligent. The court explained that

53

the driver's actions were caused by his fatigue, which, in turn, was caused by the employer's negligence in causing and permitting him to work in excess of the time determined by the ICC as likely to cause fatigue. Accordingly, an employer behaves negligently if he requires his driver to work past the point where, due to fatigue, he is physically unable to operate his vehicle with due care and diligence. Then, if the driver's physical unfitness is found to be the cause of an accident, the employer's liability for creating this dangerous situation is not dependant upon a finding that the driver himself was negligent. See also Dugas v. Pelican Construction Co., 481 F.2d 773, 776 (5th Cir. 1973)[1] (holding that the inattention of the seamen was the result of fatigue, a condition which should have been foreseen by the master, considering the unrelieved long hours and sustained heavy labor; therefore, the master's negligence was the sole proximate cause of the accident and the seamen's dereliction, if any, did not constitute negligence on their part). In my view, therefore, the question of KBR's own liability for negligently allowing Irvine to become physically unfit to operate his vehicle could be submitted to a jury without necessarily implicating Irvine's conduct or any of the myriad of military decisions which permeated the moment of the accident.

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

In this case, the undisputed evidence shows that Irvine was on duty in excess of 75 hours in the 6 days preceding the day of the accident.[2] This evidence suggests that driver fatigue caused by over-work[3] may have been a proximate cause of the accident, which supports Plaintiffs' negligent supervision claim. The majority – reaching an issue that was not addressed by the district court – concluded that Plaintiffs' reliance on this evidence was "misplaced." Supra, at Section II.C.3. The majority explained that because Irvine testified that he spent only a portion of the hours indicated on his time cards driving and that most of his time was spent performing other menial tasks, "the figures shown on Irvine's time cards do not establish whether Irvine was exhausted at the time of the May 22 convoy, and do not explain what role, if any, that purported exhaustion might have

---

[2] The time cards for the week of the accident, which Irvine testified are accurate, establish that Irvine worked 12 hours on May 16th, 14 hours on May 17th, 12.5 hours on May 18th, 12 hours on May 19th, 13.5 hours on May 20th, and 12 hours on the day before the accident, May 21st. As such, Irvine admits to working 76 hours in the six days prior to the accident. On the day of the accident, Irvine also worked a full 12-hour day.

[3] KBR's internal investigation determined that the accident was caused by the driver's traveling at "excessive speed while negotiating a curve [and] not paying attention to surroundings." There have been numerous studies on the connection between fatigue and a driver's ability to be attentive. See, e.g., David Polin, Cause of Action Against Trucker or Truck Driver for Injuries Caused by Driver Fatigue, 17 Causes of Action 2d 105 (2006) (listing 20 such studies, scientific and otherwise, in the bibliography). The negative effect fatigue has on a driver's ability to keep a proper lookout is not a newly-discovered phenomenon. Indeed, as early as 1937, the ICC passed regulations limiting a commercial driver's hours of service to protect the public from the danger posed by fatigued drivers. Ex Parte No. MC-2, In the Matter of Maximum Hours of Service of Motor Carrier Employees, 3 M.CC. 665 (I.C.C. Dec. 29, 1937) (noting that "[a] fatigued driver, whether that fatigue results from excessive hours of work or other causes, may become an inattentive, careless, or otherwise unsafe driver").

played in the accident."[4]  Id.  I do not agree with the majority's conclusion.

First, I do not believe this court should be considering the merits of

Plaintiffs' claims at this point in the litigation.[5]  We are constrained to consider

only whether the district court's findings of jurisdictional facts are clearly

---

[4] The majority also states that Irvine "clarified that the time cards reflected twelve hours of pay per day, not twelve hours of work.  He explained that the twelve hours included 'probably a lot of bunker time at night.'"  Supra, at Section II.C.3 (emphasis in original).  I disagree with this characterization of Irvine's testimony.

> In its entirety, the section of the deposition relied upon by the majority is as follows:
> Q: So from the week of 5/9 to 5/13, you worked a total of 99.5 hours?
> A: Well, that's deceptive when you look at that.
> Q: Tell me what you're talking about.
> A: We have 12 hours a day we're working.  That was probably a lot of bunker time at night.
> Q: Am I correct that you put in for 99.5 hours of total work that week [of 5/9 to 5/13]?
> A: I put in for 99.5 for pay that week.
> Q: Okay.
> A: These hours over 12 are representing hours in the bunker from mortar attacks and rocket attacks that we were required to go to the bunker.  It wasn't long after that they stopped requiring us to go to the bunker because it was costing too much money, and they just put on your PPE gear and stand by.

(Emphasis added).  In this testimony, Irvine admits to being required to work 12-hour days, but explains that time on the time cards which exceeds 12 hours for a day is probably bunker time.  Indeed, if taken at face value, the time cards at issue indicate that Irvine worked an average of 19.9 hours a day from May 9th to May 13th.  As such, it is reasonable to assume that Irvine meant that the nearly 8 hours a day in excess of his 12 working hours represented paid "bunker" time.  Irvine did not claim, as the majority suggests, that his regular 12-hour workday included "a lot of bunker time."

> If, as he claims, Irvine limited himself to working 12 hours a day, he still would have been on-duty at least 72 hours in the six days preceding the day of the accident.

[5] Furthermore, even if the jurisdictional inquiry does require consideration of the merits of the underlying claim, I believe the majority should have applied the "Rule 56 summary judgment standard" in making this inquiry.  Lawrence v. Dunbar, 919 F.2d 1525 (11th Cir. 1990) (adopting the summary judgment standard in evaluating Rule 12(b)(1) motions asserting factual challenges to subject matter jurisdiction which also implicate the merits of a claim).

56

erroneous and, based upon those facts, whether the consideration of any of the underlying claims is barred by the political question doctrine. In responding to Defendants' motion to dismiss, Plaintiffs were required to submit evidence establishing that the resolution of their negligent supervision claim would not require the reexamination of a military decision. They met this burden by submitting the deposition of Robert Stonebraker, a KBR employee and the convoy commander, who testified that although the military determined when and how it needed certain items moved, the KBR foremen were responsible for assigning specific drivers to the convoy. Nothing in the Defendants' motion to dismiss for lack of subject matter jurisdiction required Plaintiffs to submit evidence establishing causation or otherwise supporting the merits of their claims. Accordingly, the fact that the current record does not definitively show what role driver fatigue played in causing the accident is neither remarkable nor relevant to our jurisdictional inquiry.

Second, I disagree with the majority's conclusion that because Irvine was not driving for part of his working hours, the time card evidence is insufficient to support Plaintiffs' claim that fatigue was a cause of the accident. Under the regulations passed by the Federal Motor Carrier Safety Administration ("FMCSA") to ensure a safe environment for the commercial drivers and for the

57

driving public – and which KBR allegedly required its drivers to follow – a motor carrier is prohibited from permitting any driver "to drive a property-carrying commercial motor vehicle . . . for any period after . . . <u>having been on duty</u> 70 hours in any period of 8 consecutive days." FMCSR § 395.3(b) (emphasis added). This regulation specifies that, in addition to driving time, "on-duty time" means "<u>all time</u> from the time a driver begins to work or is required to be in readiness to work until the time the driver is relieved from work and all responsibility for performing work." FMCSR § 395.2 (emphasis added). Thus, in requiring Irvine to drive after being on-duty for more than 75 hours in the preceding 6 days, KBR acted in a manner which the FMCSA has proscribed for motor carriers in the United States. Indeed, a commercial driver in the United States would be considered unfit to drive under the FMCSA's regulations if he had been on-duty in excess of <u>70 hours</u> in the preceding <u>8</u> consecutive days. I believe, therefore, that the evidence raises a genuine issue of material fact as to whether driver fatigue was a contributing cause of this accident. Because deciding this issue would go to the merits of Plaintiffs' claim, the district court was required "to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." <u>Morrison v. Amway Corp.</u>, 323 F.3d 920, 925 (11th Cir. 2003). Accordingly, I believe Plaintiffs sufficiently alleged and supported a claim of

negligent supervision and, if the district court finds that a military decision is not implicated by its consideration, Plaintiffs should be given a proper opportunity to argue the merits of this claim to a factfinder.

Plaintiffs alleged that KBR's negligence in its supervision of Irvine was a proximate cause of the accident, presented evidence establishing that Irvine worked in excess of 75 hours in the 6 days before the day of the accident, and submitted sworn testimony indicating that KBR was solely responsible for providing the drivers necessary to satisfy the military's transfer needs and setting the drivers' work schedules. If KBR – not the military – was responsible for requiring Irvine to work this schedule, a jury could consider whether working such a schedule made Irvine unfit to perform his duties and thereby was a proximate cause of the accident without "reexamining a military judgment." The district court, however, made no findings of fact regarding the military's involvement in KBR's setting of its drivers' schedules or in KBR's staffing of the convoys. From the facts currently before us, then, I can not say whether a jury would be required to reexamine a military decision in resolving Plaintiffs' claim that KBR's negligence in scheduling Irvine to work 12-hour days was a proximate cause of the accident. See McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1361 n.30 (11th Cir. 2007) (noting that a challenge to the way a contractor provided

59

"'supervision necessary to perform' the missions [the military] ordered" did not necessarily "require reexamination of any decision made *by* the U.S. military"). Accordingly, I cannot agree with the majority that, under the facts as found by the district court, Plaintiffs' negligent supervision claim necessarily is barred by the political question doctrine. For this reason, I would remand this matter to the district court with instructions to make further jurisdictional findings on this issue.

I would also instruct the district court that it should apply the Rule 56 standard of review to the extent it is asked to make factual findings which implicate the merits of Plaintiffs' negligence claim. See Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990) (applying the summary judgment standard to determine whether the defendant federal employee was acting within the scope of his employment at time of his alleged negligence, because this inquiry was both a jurisdictional requirement under the Federal Tort Claims Act and an element of the underlying negligence claim). Although a district court usually has substantial authority "to weigh the evidence and satisfy itself as to the existence of its power to hear the case," Garcia v. Copenhaver, Bell & Assocs., 104 F.3d 1256, 1261 (11th Cir. 1997), it only has this authority "[i]f the facts necessary to sustain jurisdiction do not implicate the merits of plaintiff's cause of action." Morrison, 323 F.3d at 925. "If a jurisdictional challenge does implicate the merits of the

underlying claim then: [T]he proper course of action for the district court is to find that jurisdiction exists and deal with the objection as a direct attack on the merits of the plaintiff's case." Id. (quoting Garcia, 104 F.3d at 1261) (ellipses omitted). With these instructions, I would remand this matter. Accordingly, I respectfully dissent on this narrow ground.